IN THE UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

_____

No. 98-50999

_____

UNITED STATES OF AMERICA,

                                        Plaintiff-Appellee,

        versus

ANTONIO IBARRA-SANCHEZ,

                                        Defendant-Appellant.

_____

No. 98-51044

_____

UNITED STATES OF AMERICA,

                                        Plaintiff-Appellee,

        versus

MIGUEL ANGEL AGUERO-MIRANDA; RICARDO VASQUEZ,

                                        Defendants-Appellants.

_____

Appeals from the United States District Court
for the Western District of Texas

_____

December 29, 1999

Before GARWOOD, SMITH, and BENAVIDES, Circuit Judges.

GARWOOD, Circuit Judge:

        Defendants-appellants Miguel Angel Aguero-Miranda (Aguero-
Miranda), Ricardo Vasquez (Vasquez), and Antonio Ibarra-Sanchez
(Ibarra-Sanchez) were indicted for conspiracy to possess marihuana
with intent to distribute in violation of 21 U.S.C. §§ 841(a)(1)

and 846. The appellants moved to suppress approximately 344 pounds of marihuana seized on January 6, 1998 from the van in which they were riding, as well as inculpatory statements that they made to law enforcement officials after their arrest. Following an evidentiary hearing, the district court denied the motion. The appellants thereafter were convicted on their pleas of guilty and were subsequently sentenced. The guilty pleas each reserved the right to appeal the denial of the motion to suppress. FED. R. CRIM. PROC. 11 (a)(2). The appellants now appeal, challenging only the denial of the motion. We affirm.

## Facts and Proceedings Below

Between August, 1997, and January, 1998, special agents of the Drug Enforcement Agency (DEA), led by Special Agent Steve Mattas (Mattas), conducted intermittent surveillance of a residence located at 1393 Copper Ridge in El Paso, Texas. This residence was the home of appellant Aguero-Miranda, his wife, Jacqueline Aguero, and her children. Based on their observations over this five-month period, Mattas and the other agents suspected that the Copper Ridge residence housed an on-going illicit drug operation.

From their surveillance of the trash at the Copper Ridge residence, Mattas and the DEA agents discovered phone records revealing that multiple calls had been made to phone numbers associated with other DEA investigations. Their searches also revealed several five-pound zip-lock baggies covered with duct tape, a practice which in Mattas's experience was consistent with the transportation of drugs and currency. A police dog trained to detect the presence of currency positively

2

identified the baggies as having contained currency. Other suspicious trash findings included plane tickets to Hawaii and Mexico, bills that were all in Mrs. Aguero's name, and bank statements indicating large monthly deposits, even though the residents at Copper Ridge had no discernable employment.

The trash searches also revealed utility bills and mortgage statements for a residence on Rainbow Ridge, located directly behind the Copper Ridge home. His attention drawn to the Rainbow Ridge residence, Mattas noted that it was unkempt and run-down, which was unusual for that affluent part of El Paso. No one appeared to be living there on any consistent basis, and the agents observed heavy foot and vehicle traffic between the two residences. From these observations, Mattas surmised that the Rainbow Ridge residence was in all likelihood a "stash house," that is, an unoccupied house used for the storage of drugs.

In the course of his surveillance of the Copper Ridge and Rainbow Ridge residences, Mattas observed approximately six vehicles, including the beige van at issue in this appeal, coming and going from the houses at various times. Some of the vehicles had temporary license tags, some had tags that were associated with other DEA investigations, and some would remain parked in front of the houses, virtually abandoned, for weeks at a time. At the suppression hearing, Mattas testified that this large number of vehicles was unusual even for an affluent area–and especially unusual when the residents did not appear to work. Mattas concluded that this activity was consistent with drug trafficking. He also identified one of the most frequent visitors to the Copper Ridge house as Gilberto Villanueava (Villanueava), whom the agents later (and

3

before January, 1998) determined was wanted for questioning in connection with the abduction of a DEA agent in Mexico in 1995, as well as another DEA investigation. According to Mattas, Villanueava often shuttled back and forth between the Copper Ridge and Rainbow Ridge residences, and unlike most of the other visitors, was actually allowed inside the Copper Ridge residence.

On the evening of January 6, 1998, the beige van made its first appearance in over a month. As the van pulled into the driveway of the Rainbow Ridge residence, Mattas observed the motion-sensitive light above the driveway go on and at least two individuals exit the van and enter the residence. A minute or two later, the van left the Rainbow Ridge residence; after approximately thirty minutes, it returned. Mattas then saw three men loading several large objects, which appeared to be duffel bags, into the van. He testified that sometime during the course of these events the motion-sensitive light had been deactivated, and that the loading of the van took place in the dark. Mattas found it suspicious that these individuals would load the van in the dark "when the average person would have wanted to have light out there so they could see what they were doing."

Mattas followed the van as it departed from Rainbow Ridge. Believing that the van was loaded with drugs, and that he would need assistance in stopping it, Mattas contacted by mobile phone another DEA agent and the El Paso Police Department (EPPD).[1] He instructed the EPPD

---

[1]  At the suppression hearing, Mattas testified that he did not attempt to stop the van himself because his vehicle was not equipped with emergency lights or a siren, and because he did not want to reveal the existence of the DEA investigation to Aguero-Miranda or any of the van's other occupants.

dispatcher to relay a message to EPPD officers that a DEA agent needed assistance in stopping the van. Mattas also requested the dispatcher to tell the officers to form their own reasonable suspicion before stopping the van. The dispatcher failed to communicate this last instruction, however, and instead merely issued a radio bulletin that a DEA agent had requested assistance in stopping the beige van because it was possibly transporting drugs or weapons.

After hearing the bulletin, EPPD Patrolman Jose Guerra (Guerra) observed the van heading east on Interstate 10. Guerra activated his emergency lights and began his pursuit. While being followed on the freeway by Guerra, the van passed an EPPD Special Weapons and Tactics (SWAT) team on its way home from a training session at the police academy. Aware of the dispatcher's message, the SWAT team joined in the chase and aided Guerra in making a "felony stop" of the van at an exit off the highway.[2] The SWAT team, Guerra, and Guerra's partner all approached the stopped van with pistols and shotguns drawn. As they drew near, but before they looked inside it, the officers could smell a strong odor of marihuana emanating from within the van.[3] The officers ordered the three occupants–driver appellant Ibarra-Sanchez, front seat passenger appellant Aguero-Miranda, and back seat passenger appellant Vasquez–to exit the van and kneel down on the ground. Guerra handcuffed the men and with the help of other officers placed them in the back

_____

[2] While not entirely clear, it appears that a "felony stop" is a detention procedure that involves ordering occupants of a vehicle to exit when police officers believe their safety is at risk.

[3] One member of the SWAT team, Lawrence Lujan, testified at the suppression hearing that he could smell the marihuana two or three feet away from the van.

5

seats of three separate patrol cars. The officers then conducted a "protective sweep" of the van for other occupants or weapons, and discovered three duffel bags, as well as some smaller bags, which were later determined to contain approximately 344 pounds of marihuana.

At some point during this time period, Mattas arrived and identified himself as the agent who had requested the stop. The officers informed Mattas that they had conducted the protective sweep of the van and had discovered a large amount of marihuana. Mattas later testified that he could smell the marihuana when he was five or ten feet away from the van. After conferring with the EPPD officers, Mattas seized the marihuana. The appellants were then formally arrested and taken to EPPD headquarters, where Aguero-Miranda and Vasquez made inculpatory statements to EPPD officers. Ibarra-Sanchez made no post-arrest statements.

The appellants were charged in a one-count indictment with conspiracy to possess marihuana with intent to distribute in violation of 21 U.S.C. §§ 841(a)(1) and 846. Arguing that the initial "felony stop" constituted an arrest and search for which there was no probable cause, the appellants filed a motion to suppress the marihuana and statements. The district court conducted a suppression hearing on June 12, 1998, and denied the motion on July 7, 1998 in a memorandum order. The appellants then pleaded guilty to the indictment, reserving the right to appeal the denial of the motion. On October 16, 1998, the district court sentenced Aguero-Miranda to sixty months of imprisonment, followed by a four year period of supervised release; Vasquez to thirty-seven months of imprisonment and three years of supervised release; and

6

Ibarra-Sanchez to thirty months of imprisonment and three years of supervised release. The appellants now appeal, complaining only of the denial of their suppression motion.[4]

## Discussion

The district court found that in conducting the "felony stop," the EPPD officers "effected a warrantless arrest of the van's occupants and then proceeded to search it," all without probable cause. The court denied the motion, however, on the basis of the "good faith" exception to the exclusionary rule of the Fourth Amendment. *See United States v. Leon*, 104 S.Ct. 3405 (1984); *United States v. DeLeon-Reyna*, 930 F.2d 396, 400 (5th Cir. 1991) (*en banc; per curiam*). According to the district court's interpretation of the events at issue, the EPPD officers reasonably relied on the dispatcher's erroneous relay of Mattas's request, and thus executed the "felony stop" of the van in the "good faith," though erroneous, belief that they were authorized to do so. We do not address the district court's reliance on the "good faith" exception to justify the officers' conduct. Instead, we affirm the denial of the motion to suppress because the officers had reasonable suspicion to stop the van, and did not search it until they had probable cause to do so as a result of having smelled the marihuana; in addition, any alleged illegality associated with the "warrantless arrest" was too attenuated from the drugs or statements to require suppression. The evidence on these issues is undisputed.

When reviewing a district court's ruling on a motion to suppress

---

[4]The separate appeal of Ibarra-Sanchez (No. 98-50999) has been consolidated with that of Aguero-Miranda and Vasquez (No. 98-51044).

based on live testimony at a suppression hearing, we will accept the court's factual findings "unless the findings are clearly erroneous or influenced by an incorrect view of the law." *United States v. Lanford*, 838 F.2d 1351, 1354 (5th Cir. 1988). We review questions of law *de novo.* "To the extent the underlying facts are undisputed . . . we may resolve questions such as probable cause and reasonable suspicion as questions of law." *Blackwell v. Barton*, 34 F.3d 298, 305 (5th Cir. 1994). Finally, we may affirm the district court's decision on any basis established by the record. *See United States v. McSween*, 53 F.3d 684, 687 n.3 (5th Cir. 1995).

I.  Reasonable Suspicion to Stop the Van

The appellants contend that the EPPD officers lacked reasonable suspicion to stop the van. We disagree. Under the principles of *Terry v. Ohio*, 88 S.Ct. 1868 (1968), it is now well-established that law enforcement officers may briefly detain pedestrians and motorists in public, even without probable cause to arrest them, so long as the officers have reasonable suspicion to believe that criminal activity is afoot. *See Baker*, 47 F.3d at 693. Officers must base their reasonable suspicion on "specific and articulable facts," not merely "inarticulate hunches" of wrongdoing. *Terry*, 88 S.Ct. at 1880. Moreover, the facts giving rise to reasonable suspicion "must be judged against an objective standard." *Id.*

It is clear that when Mattas made the call to the EPPD dispatcher, he possessed reasonable suspicion to stop the van himself. Over the five-month period of surveilling the Copper Ridge and Rainbow Ridge residences, Mattas and the other agents discovered a veritable

8

cornucopia of factors suggesting drug-related activities: currency wrappers; phone records connecting the residents to other DEA investigations; plane tickets to at least one known drug source country (Mexico); the fact that the Copper Ridge records were all in Aguero-Miranda's wife's name (thus insulating Aguero-Miranda's identity and possibly protecting the house from criminal forfeiture); the lack of any visible employment on the part of the residents;  the Rainbow Ridge "stash house" nearby; the motley fleet of vehicles appearing sporadically at the two residences; and the regular presence of Villanueava, a suspected drug trafficker.  On the evening of January 6, 1998, Mattas and the other agents also observed the beige van twice arrive and depart from the Rainbow Ridge residence, and the three men load the van with large duffel bags while in complete darkness.  Any analysis of reasonable suspicion is necessarily fact-specific, and factors which by themselves may appear innocent, may in the aggregate rise to the level of reasonable suspicion. *See id.* at 1880-81. *See also United States v. Holloway*, 962 F.2d 451, 459 (5th Cir. 1992).[5] Taken together, these factors all presented objective indications not only that the Copper Ridge and Rainbow Ridge residences were being used for narcotics trafficking, but also that the three men had just loaded a substantial amount of drugs into the van. *See United States v. Coleman*, 969 F.2d 126, 129-30 (5th Cir. 1992) (finding reasonable

---

[5]"The reasonable suspicion standard does not require . . . that the circumstances be such that there is no reasonable hypothesis of innocent behavior." *United States v. Basey*, 816 F.2d 980, 989 (5th Cir. 1987). Our determination of reasonable suspicion is made by looking at all the circumstances together to "weigh not the individual layers but the 'laminated' total." *United States v. Edwards*, 577 F.2d 883, 895 (5th Cir. 1978).

suspicion to make a *Terry* stop from a similar combination of factors consistent with drug trafficking). Indeed, based on Mattas's experience and the probability that a drug transaction was about to take place, "[i]t would have been poor police work" for him not to have called for assistance in stopping the van at that moment. *Terry*, 88 S.Ct. at 1881.

We note that, notwithstanding the appellants' argument to the contrary, the fact that Mattas had not previously obtained a search or arrest warrant is not fatal to the propriety of the stop. Even if Mattas would have been successful in obtaining a warrant before the stop, officers are not required to do so as soon as it is practicable to do so. *See United States v. Carillo-Morales*, 27 F.3d 1054, 1063 (5th Cir. 1994). Mattas and the agents had reasonable suspicion to stop the van when it pulled away from the Rainbow Ridge residence; the absence of an earlier search or arrest warrant in no way renders that stop illegal.

The actual stop of the van by the EPPD officers was lawful because under what is sometimes referred to as the "collective knowledge" doctrine, the officers shared Mattas's reasonable suspicion. The officers stopped the van in reliance on the dispatcher bulletin, and therefore were not required to have personal knowledge of the evidence that created Mattas's reasonable suspicion. *See United States v. Hensley*, 105 S.Ct. 675, 681-82 (1985). Instead, if Mattas possessed sufficient reasonable suspicion to stop the van when he made his call to the dispatcher, then the actual stop by the EPPD officers, acting on the dispatcher's bulletin, was also supported by reasonable suspicion.

10

*See id.* at 682 ("[I]f a flyer or bulletin has been issued on the basis of articulable facts supporting a reasonable suspicion that the wanted person has committed an offense, then reliance on that flyer or bulletin justifies a stop . . . ."); *United States v. Armendariz-Mata*, 949 F.2d 151, 153 (5th Cir. 1991); *see also United States v. Vasquez*, 534 F.2d 1142, 1145 (5th Cir. 1976) (discussing the "collective knowledge" doctrine). Mattas's request that the officers form their own reasonable suspicion does not negate the fact that he had sufficient suspicion to stop the van.[6] The "collective knowledge" doctrine therefore preserves the propriety of the stop.

## II. Probable Cause to Search

Appellants contend that the EPPD officers had no probable cause to conduct either a search or an arrest, but in fact it is quite clear that the officers had probable cause to search the van. After stopping the van, the EPPD officers approached it with their weapons drawn. As they did so, they detected the distinct odor of marihuana wafting out. The officers then ordered the appellants out of the van and conducted a "protective sweep." At the suppression hearing, a member of the SWAT team testified that he smelled the marihuana when he was two or three feet away from the van, and Mattas testified that he could smell it from

---

[6] The parties make much of the dispatcher's failure to relate Mattas's instruction that the EPPD officers form their own reasonable suspicion before stopping the van. This argument is immaterial, however, because under the "collective knowledge" doctrine, the EPPD officers did not need to form their own suspicion. The admissibility of the evidence recovered during this lawful stop turns on whether Mattas, the officer who made the request for assistance, possessed the requisite reasonable suspicion to make the stop. *See Hensley*, 105 S.Ct. at 681 (discussing a similar point in the context of probable cause to arrest). Having established that Mattas did have sufficient reasonable suspicion to stop the van, the dispatcher's error is irrelevant.

five to ten feet away. Regardless of precisely how near or far from the van the officers were when they detected the odor, once they did so they possessed probable cause to search the van. This Court has consistently held that the smell of marihuana alone may constitute probable cause to search a vehicle. *See*, *e.g.*, *McSween*, 53 F.3d at 686-87; *United States v. Reed*, 882 F.2d 147, 149 (5th Cir. 1989)(observing that the smell of marihuana "in itself would have justified the subsequent search of Reed's vehicle"); *United States v. Henke*, 775 F.2d 641, 645 (5th Cir. 1985) ("Once the officer smelled the marijuana, he had probable cause to search the vehicle."); *United States v. Villareal*, 565 F.2d 932, 937 (5th Cir. 1978) ("The odor of marijuana detected by [the officer] as emanating from the car furnished him with probable cause to search the trunk."). This probable cause arose before any appellant exited the vehicle and before any officer touched it, and, as discussed below, depended in no way on the subsequent conduct of the EPPD officers.[7]

---

[7] We note that the subsequent "protective sweep" might also be justified under *Michigan v. Long*, 103 S.Ct. 3469 (1983), as a "*Terry* pat-down" of the van. In *Long*, the Supreme Court held that "the search of the passenger compartment of an automobile, limited to those areas in which a weapon may be placed or hidden, is permissible if the police officer possesses a reasonable belief based on 'specific and articulable facts which, taken together with the rational inferences from those facts, reasonably warrant' the officers in believing that the suspect is dangerous and the suspect may gain immediate control of weapons." *Id.* at 3481 (quoting *Terry*, 88 S.Ct. at 1880). In this case, the EPPD officers received a bulletin indicating that the van in question might be carrying drugs, weapons, or both. Moreover, the officers smelled marihuana as soon as they drew near to the van. These facts appear to be objective, reasonable indicia of a dangerous situation and would in all probability justify a weapons search of the passenger compartment. *See Baker*, 47 F.3d at 693-94 (upholding protective search of passenger compartment of vehicle based on officer's reasonable concern for safety); *Coleman*, 969 F.3d at 131 (same).

12

III.  Detention vs. Arrest

The appellants further contend that even if the initial stop of the van was lawful, the EPPD officers violated the appellants' Fourth Amendment rights by ordering them out of the van, pointing their weapons at them, forcing them to kneel on the ground, handcuffing them, and then placing them in the back of police vehicles.  The appellants argue that the EPPD officers converted a *Terry* stop based on reasonable suspicion into a full-blown arrest for which the officers had no probable cause.  We conclude that whether or not this show of force amounted to a *de facto* arrest is ultimately irrelevant because neither the evidence seized from the van nor the appellants' later statements were not a product of the alleged arrest.

The EPPD officers acted lawfully by ordering the occupants to exit the van after the stop.  It is settled that officers conducting a lawful *Terry* stop of a vehicle may order both the driver and the passengers to exit the vehicle pending completion of the stop.  In *Pennsylvania v. Mimms*, 98 S.Ct. 330, 333 (1977) (*per curiam*), the Supreme Court held that once a motor vehicle has been lawfully stopped for a traffic violation, police officers may order the driver out of the vehicle.  Later, in *Maryland v. Wilson*, 117 S.Ct. 882, 886 (1997), the Court extended *Mimms* to passengers. *See Knowles v. Iowa*, 119 S.Ct. 484, 488 (1998).  The touchstone of *Mimms* and *Wilson* is that officer safety is potentially threatened whenever officers stop a vehicle.  *See Mimms*, 98 S.Ct. at 333 ("[W]e have specifically recognized the inordinate risk confronting an officer as he approaches a person seated in an automobile.").  Rarely are concerns for officer safety more paramount

13

than during the stop of a vehicle suspected of transporting drugs. *See Coleman*, 969 F.2d at 131 n.20 ("Weapons and violence are frequently associated with drug transactions, of course.") (citing *United States v. Wiener*, 534 F.2d 15, 18 (2d Cir. 1976)). In the present case, the EPPD officers received a bulletin alerting them to a possible drug or weapons scenario, and were entirely within their rights in ordering the occupants out of the van.

Whether the officers' subsequent conduct-training their weapons on the appellants, ordering them to kneel, handcuffing them, and then placing them in squad cars-amounted to a warrantless arrest is unclear. As we have observed, "[t]he line between a valid investigatory stop and an arrest requiring probable cause is a fine one." *United States v. Hanson*, 801 F.2d 757, 763 (5th Cir. 1986); *compare United States v. Roch*, 5 F.3d 894, 897 (5th Cir. 1993) (finding that the defendant had been "arrested or seized" when "the first words spoken by the police officer who had his gun drawn was a command for Roch to get face down on the ground and then, without further inquiry, Roch was handcuffed") *with United States v. Sanders*, 994 F.2d 200, 207 (5th Cir. 1993) ("[I]n and of itself, the mere act of drawing or pointing a weapon during an investigatory detention does not cause it to exceed the permissible bounds of a *Terry* stop or to become a *de facto* arrest.") *and United States v. Campbell*, 178 F.3d 345, 349 (5th Cir. 1999) ("[D]rawn guns and handcuffs do not necessarily convert a detention into an arrest.").

We do not resolve this issue, for even if the show of force by the officers constituted an illegal arrest, it would not affect our ultimate disposition because neither the drugs nor the statements were products

14

of the alleged post-stop arrest. To warrant suppression, the challenged evidence must have been obtained "by exploitation of [the alleged] illegality" rather than "by means sufficiently distinguishable to be purged of the primary taint." *Wong Sun v. United States*, 83 S.Ct. 407, 417 (1963). This Court has recognized that the exclusionary rule's bar to admitting evidence "only extends from the 'tree' to the 'fruit' if the fruit is sufficiently connected to the illegal tree." *Passman v. Blackburn*, 652 F.2d 559, 564 (5th Cir. 1981) (holding that evidence was admissible because it was not derived from illegal police action); *see also United States v. Sheppard*, 901 F.2d 1230, 1234 (5th Cir. 1990) (finding evidence admissible if causal connection between alleged police illegality and evidence introduced a trial is broken); *United States v. Nooks*, 446 F.2d 1283, 1288 (5th Cir. 1971) (same).

In this case, the marihuana and statements were not gained by "exploitation" of the allegedly illegal arrest. As discussed above, the EPPD officers smelled the marihuana as they approached the van and thereby had probable cause to search the van while the appellants were still inside. Similarly, the statements were taken at EPPD headquarters after formal arrest based on the discovery of the marihuana. The reasonable suspicion to stop the van developed into probable cause to search it when the marihuana was smelled, and once the marihuana was discovered, the officers lawfully arrested the appellants. After the appellants were ordered out of the van, it made no difference to the ultimate result whether they stood by the side of the road or sat handcuffed in police cars: in either situation, the officers would have discovered the marihuana and arrested them. In short, there is no

15

causal link between the alleged "arrest" of the appellants and the evidence later introduced at trial; the drugs and statements were not fruits of that particular tree. Therefore there is no reason to suppress the marihuana or the statements.

## Conclusion

The district court's order denying the appellants' motion to suppress, and appellants' convictions and sentences, are AFFIRMED.