**UNITED STATES COURT OF APPEALS**

**FOR THE FIFTH CIRCUIT**

_____

No. 97-41154
_____

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

LARRY WAYNE PERKINS,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Eastern District of Texas
1:96-CR-105-1
_____

July 11, 2000

Before POLITZ, SMITH, and DENNIS, Circuit Judges.

POLITZ, Circuit Judge:[*]

Larry Wayne Perkins appeals, *inter alia*, the denial of his motion to suppress

evidence and motion to suppress inculpatory statements. For the reasons assigned, we

---

[*]Pursuant to 5TH CIR. R. 47.5, the Court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

affirm.

## BACKGROUND

On June 13, 1996, shortly before noon, Detective Harry Leroy Kelley of the Cleveland, Texas Police Department received a tip from a confidential informant that Perkins and a co-defendant, Lawanza Craig Lillie, would travel that day to Houston to purchase crack cocaine and immediately return to Cleveland to distribute it. Detective Kelley, assigned to the narcotics unit, knew the confidential informant had been used to make controlled drug purchases on 22 prior occasions. The informant reported that Perkins and Lillie would travel southbound on Highway 59 in a red Chevrolet pickup truck to the Westmont area of Houston where they would purchase the crack. The informant identified Perkins and Lillie by name, provided the license plate number of the truck, and advised that after the purchase the two would return immediately to Cleveland by way of Highway 59. A total of three calls were made by the informant, who stated that he was calling from a pay phone across the street from where the defendants were located. In the last call, the informant reported that Perkins and Lillie were leaving in the truck bound for Houston.

At about 2:00 p.m. that day Kelley contacted Detective Mark Bradshaw, an undercover officer with the Harris County Organized Crime Unit assigned to the Humble Police Department. Kelley forwarded the information he had received from

2

the informant and requested that the Humble police intercept the vehicle and look for the drugs. Bradshaw related this information to Sergeant Sidney Draper, but did not provide the names of the truck's occupants, describing them only as two black males. Another Humble officer ran a check on the vehicle and discovered that its owner had a "violent history." Knowing the exact time Perkins and Lillie had departed Cleveland for Houston, Kelley estimated that they would pass through Humble, on their return, near 3:00 p.m. This information was provided to several Humble patrol units located in the Highway 59 area. The names of Perkins and Lillie were not made known to the Humble officers, who assumed that the driver of the truck was its owner and, thus, possibly dangerous. Neither Perkins nor Lillie, however, owned the pickup.

At approximately 3:00 p.m., Detective David Williams saw the truck traveling northbound on Highway 59 and alerted other units stationed a few miles ahead. Officer Blanchard spotted the pickup and pulled it over. Perkins and Lillie were ordered out of the truck, placed on their knees, and immediately handcuffed. Because Perkins was 6 feet 3 inches tall and weighed over 400 pounds, two sets of handcuffs were required. Each defendant was frisked; no weapons or drugs were found. Within minutes of the stop at least six other officers arrived.[1] Lillie was placed in the back of Blanchard's

---

[1] At the suppression hearing, Sergeant Draper testified that upon arriving at the scene he saw two Humble police cars, a detective's car, and a City of Houston motorcycle unit. Officer Theis, who arrived after Draper, testified that he saw "a couple of detective units and two to three police officers

patrol unit and Perkins was placed in the front passenger seat of Sgt. Draper's vehicle.[2]

Detective Williams arrived shortly after the stop and was advised that Perkins had been given the **Miranda** warnings but, because he had not heard same, Williams again advised Perkins of his rights.

No drugs or weapons were found during the preliminary search of the vehicle. The officers requested drug sniffing dogs. Perkins subsequently asked and was granted permission to use the police cellular phone to call his mother.[3] After doing so, he told the officers where the drugs were hidden on his person.[4] A search disclosed 90.7 grams of crack cocaine. Perkins and Lillie were transported to the Humble Police Department and received another **Miranda** advisory. Perkins subsequently confessed his involvement in the crack cocaine purchase.

Perkins was charged in a superseding indictment with one count of conspiracy to distribute and possess with the intent to distribute crack cocaine, and four counts of distribution of crack cocaine, in violation of 21 U.S.C. §§ 846 and 841. He filed two

and... Sergeant Draper." Detective Williams testified that he saw eight officers at the scene when he arrived.

[2]The officers testified that Perkins was placed in the front seat of the vehicle for comfort as it was a very hot day, Perkins was sweating profusely, and the auto's air conditioner was on. Perkins testified that he was placed in the front seat because he was too large to fit in the back seat.

[3]Perkins remained handcuffed during the call; Sgt. Draper dialed the number and held the phone to Perkins' ear and mouth as he spoke with his mother.

[4]The drugs were secured in the folds of his lower stomach.

motions to suppress the evidence seized and the statements obtained, contending that they were fruits of an unlawful stop and search of the vehicle and arrest. The district court denied both motions, finding that the police conducted a lawful investigatory stop, on reasonable suspicion based on the information from the confidential informant. The court further concluded that the means used by the police to secure the defendants was justified in light of their reasonable belief that the driver of the vehicle was potentially armed and dangerous. Finally, the court found that the confession by Perkins was given knowingly and voluntarily. Prior to trial Perkins entered a conditional plea of guilty to one count of conspiracy to distribute and possess with the intent to distribute cocaine base in violation of 21 U.S.C. § 846, reserving the right to appeal the denial of his motions to suppress and any sentencing guideline determinations. Subsequent to his guilty plea, but prior to sentencing, Perkins filed numerous motions, including a Motion to Withdraw Conditional Plea of Guilty, a Motion to Dismiss Indictment Based Upon Prosecutorial Misconduct and/or Vindictiveness, and a Second Motion for Discovery. After conducting a hearing, the district court denied these motions and sentenced Perkins to 120 months' imprisonment and five years supervised release. This timely appeal followed.

## ANALYSIS

The standard of review of a district court's decision on a motion to suppress is

5

well-settled. Conclusions of law are reviewed *de novo,* findings of fact will be accepted unless clearly erroneous or based on an incorrect view of the law, and the evidence must be reviewed in the light most favorable to the prevailing party.[5] Further, we may affirm the district court's suppression decision on any basis established by the record.[6]

Perkins contends that the district court erred in denying his motions to suppress. He complains that the officers did not have probable cause to arrest him based on the tip of the confidential informant because the informant was not proven to be reliable, and none of the information provided in the tip was corroborated. He also asserts that his arrest actually occurred when he was removed from the vehicle, handcuffed, and placed in the patrol car.[7] He claims that at this point, this was not a detention but an actual arrest for which, at that time, no probable cause existed. Additionally, he contends that the district court erred in denying his motion to suppress the inculpatory statements made at the police station, claiming that they were coerced.

---

[5]**United States v. Tompkins,** 130 F.3d 117 (5th Cir. 1997), *cert. denied,* 523 U.S. 1036 (1998); **United States v. Cardenas,** 9 F.3d 1139 (5th Cir. 1993).

[6]**United States v. Ibarra-Sanchez,** 199 F.3d 753 (5th Cir. 1999) *reh'g denied,* 203 F.3d 356 (5th Cir. 2000).

[7]Perkins also claims that Officer Blanchard had her gun drawn when she ordered him and Lillie out of the car. The government denies this allegation and the record contains no evidence on this point.

We entertain no doubt whatsoever that the Humble police had reasonable suspicion to believe that Perkins and Lillie were involved in unlawful drug trafficking, based on the specific and detailed information provided to Kelley by the confidential informant, thereby warranting an investigatory stop of the vehicle.[8]  The confidential informant who reported the defendants' impending activities was personally known to Kelley, had provided the Cleveland police with information regarding drug deals a substantial number of times in the past, and had made controlled drug purchases for the authorities on more than a score of occasions.  The informant gave an exact description of the make, model, color and license plate number of the vehicle Perkins and Lillie would take to Houston.  Additionally, he advised of their exact travel route, the specific drug to be purchased, and the return route and approximate time thereof.  This information was confirmed when the Humble police saw the identified pickup traveling north on the designated route near the appointed time, containing two occupants fitting the description provided.  Under the "collective knowledge" doctrine, the Humble police shared Kelley's reasonable suspicion, as they acted in reliance on the information forwarded to them by the detective.[9]

---

[8]**Terry v. Ohio,** 392 U.S. 1 (1968); **United States v. Michelletti,** 13 F.3d 838 (5th Cir. 1994) (en banc).

[9]**Ibarra-Sanchez,** 199 F.3d at 759.

Whether the amount of force used by the police to detain Perkins and Lillie exceeded the bounds of a permissible investigatory detention presents a closer question. A **Terry** stop must "last no longer than is necessary to effectuate the purpose of the stop, and... the police should use the least intrusive means reasonably available to verify or dispel their suspicions in a short period of time."[10] Under **Terry** and its progeny, some use of force during an investigative stop may be justified if an officer has reason to believe that "the individual whose suspicious behavior he is investigating at close range is armed and presently dangerous to the officer or others."[11] "The line between a valid investigatory stop and an arrest requiring probable cause is a fine one,"[12] but in considering whether the actions of the police were justified under the circumstances, the Supreme Court has cautioned the courts "not [to] indulge in unrealistic second-guessing."[13] With that in mind, "[we] must determine case by case whether the police were unreasonable in failing to use less intrusive procedures to

---

[10]**United States v. Sanders,** 994 F.2d 200, 203-04 (5th Cir. 1993) (quoting **Florida v. Royer,** 460 U.S. 491, 500 (1983) (plurality opinion)).

[11]**Terry,** 392 U.S. at 24; **United States v. Hensley,** 469 U.S. 221, 235 (1985) (an officer is "authorized to take such steps as [are] reasonably necessary to protect their personal safety and to maintain the status quo during the course of the stop").

[12]**United States v. Hanson**, 801 F.2d 757, 763 (5th Cir. 1986).

[13]**United States v. Sharpe,** 470 U.S. 675, 686-87 (1985) ("A creative judge engaged in post hoc evaluation of police conduct can almost always imagine some alternative means by which the objectives of the police might have been accomplished.").

8

conduct their investigation safely."[14]

We have upheld the use of drawn weapons and handcuffs during a **Terry** stop. In **Sanders** we held that the officer's actions were within the parameters of a valid detention where he immediately drew his weapon and ordered an individual suspected of carrying a firearm to lie down on the ground. Further, we concluded that because the suspect did not comply with this order, the officer was justified in handcuffing the detainee prior to frisking him. Such action prevented the suspect from fleeing and simultaneously ensured the safety of the investigating officer and the innocent bystanders.[15]

More recently, in **United States v. Campbell,**[16] we held that the officers stayed within the ambit of a valid **Terry** stop upon encountering three individuals, two of whom fit the description of an armed robber, as the three were about to enter a vehicle alleged to have been used as the getaway car in an armed robbery committed the previous day. The officers held the three at gunpoint, handcuffed the two suspects, and

---

[14]**Sanders,** 994 F.2d at 206-07; **Sharpe**, 470 U.S. at 687 ("The question is not simply whether some other alternative was available, but whether the police acted unreasonably in failing to recognize or to pursue it.").

[15]994 F.2d at 207-08.

[16]178 F.3d 345 (5th Cir. 1999).

told them to get down on the ground prior to frisking them for weapons.[17]  One of the suspects was handcuffed for the entirety of the approximately 25 minute detention.

**Sanders** and **Campbell** provide the rubrics for the instant review.  Accordingly, we hold that the actions of the officers—ordering Perkins and Lillie out of the truck and down to their knees, handcuffing them, and placing them in the patrol cars—all were reasonable acts under the relevant circumstances.[18]  The police here had reason to believe that Perkins and Lillie were engaged in unlawful drug trafficking.  "Rarely are concerns for officer safety more paramount than during the stop of a vehicle suspected of transporting drugs."[19]  Given Perkins' unusually large size, and the officers' advisory that the vehicle's owner had a history of violence, the police were justified, as in

---

[17]**Id.** at 349-50.

[18]Perkins relies on **United States v. Roch,** decided four months after **Sanders**, in which we stated that the defendant was "'arrested or seized' in the clearest sense of those words" when "[t]he first words spoken by the police officer who had his gun drawn was a command for Roch to get face down on the ground, and then, without further inquiry, Roch was handcuffed." 5 F.3d 894, 897 (5th Cir. 1993).
    **Roch** is not controlling, however, as the statement regarding the amount of force used by the police was not necessary to the decision in the case and, thus, was merely dicta.  The **Roch** court ultimately found that the information provided by the confidential informant lacked a sufficient indicia of reliability to give the police reasonable suspicion that the defendant had been or was engaged in criminal activity.  Similarly, the surveillance of the defendant by the officers failed to produce a basis for reasonable suspicion independent of the informant's information.  **Id.** at 897-99.
    Significantly, **Sanders** is not mentioned anywhere in the opinion, and **Roch** has never been cited as authority in this context.

[19]**Ibarra-Sanchez,** 199 F.3d at 761; **United States v. Coleman,** 969 F.2d 126, 131 n.20 (5th Cir. 1992) ("Weapons and violence are frequently associated with drug transactions, of course.") (citing **United States v. Weiner,** 534 F.2d 15 (2d Cir. 1976)).

**Sanders** and **Campbell,** in using handcuffs to ensure their safety. Although Perkins was frisked and no weapons were found, it does not follow that he no longer posed a danger to the officers such that removal of the handcuffs was mandated.[20]

Similarly, the officers did not act unreasonably by placing Perkins in the police car while they conducted their investigation. At least five of our sister circuits have held that detaining a suspect in a police car during the course of an investigation does not necessarily transform a **Terry** stop into an arrest.[21] We therefore find no error in the district court's refusal to suppress the crack cocaine recovered at the scene.

We likewise conclude that the district court did not err in refusing to suppress Perkins' inculpatory statements made at the Humble police station. A confession is deemed voluntary if, under the totality of the circumstances, the statement is the product of the accused's free and rational choice.[22] In making this legal evaluation we give credence to the credibility choices and findings of fact of the district court, unless

---

[20]**Sanders,** 994 F.2d at 209.

[21]*See e.g.,* **United States v. Gil,** 204 F.3d 1347 (11th Cir. 2000); **United States v. Navarrete-Barron,** 192 F.3d 786 (8th Cir. 1999); **United States v. Torres-Sanchez,** 83 F.3d 1123 (9th Cir. 1996); **United States v. Leshuk,** 65 F.3d 1105 (4th Cir. 1995); **Pliska v. City of Stevens Point,** 823 F.2d 1168 (7th Cir. 1987).

[22]**United States v. Doucette,** 979 F.2d 1042 (5th Cir. 1992).

11

we find same to be clearly erroneous.[23]

The testimony adduced at the suppression hearing establishes that Perkins was given **Miranda** warnings on three separate occasions, the final time at the police station just before his confession. Perkins, a college graduate, initialed each paragraph of the requisite warning, clearly reflecting that he understood his rights. Further, he dictated his confession to Detective Williams, thereafter signing same. The record contains no evidence, aside from Perkins' unsupported assertions of coercion, that his decision to confess was other than totally voluntary. The district court's credibility determinations thereon were not clearly erroneous.[24]

Perkins next contends that the district court erred in denying his requests: (1) to withdraw his guilty plea; (2) to dismiss the indictment based on prosecutorial misconduct; and (3) for discovery. We do not address these issues; Perkins waived the right to appeal same in his plea agreement.

A defendant may waive his statutory right to appeal as part of a valid plea agreement.[25] To be valid, a defendant's waiver must be informed and voluntary.[26] If

---

[23]**United States v. Raymer,** 876 F.2d 383 (5th Cir. 1989).

[24]**United States v. Bass,** 10 F.3d 256 (5th Cir. 1993); **Doucette,** 979 F.2d at 1046.

[25]**United States v. Melancon,** 972 F.2d 566 (5th Cir. 1992).

[26]**United States v. Portillo,** 18 F.3d 290 (5th Cir. 1994).

the record of a Rule 11 hearing clearly reflects that the defendant read and understood his plea agreement, and that he raised no question about a waiver-of-appeal provision, the defendant will be held to the bargain whether or not the court specifically admonished him concerning the waiver.[27]

In the case at bar, the written plea agreement specifically provided that Perkins waived his right to appeal, excepting only the district court's decision on his motions to suppress and any sentencing guideline determinations. At the plea hearing, the district judge summarized the agreement, specifically admonishing Perkins with regard to the waiver provision. Perkins acknowledged that he understood the agreement's terms and its consequences. He made no objection whatever to the agreement or its provisions. We find and conclude that Perkins knowingly and voluntarily waived his right to appeal these issues. We find no reversible error in this appeal.

AFFIRMED.

---

[27]**Id.** at 293.

13