# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

January 5, 2012

No. 10-40156

Lyle W. Cayce
Clerk

UNITED STATES OF AMERICA,

Plaintiff - Appellee

v.

JULIO ANTONIO GONZALEZ-RODRIGUEZ, also known as Julio Antonio
Rodriguez Gonzalez,

Defendant - Appellant

Appeal from the United States District Court
for the Southern District of Texas
USDC No. 7:08-CR-819-1

Before KING, JOLLY, and WIENER, Circuit Judges.

PER CURIAM:[*]

Defendant-Appellant Julio Antonio Gonzalez-Rodriguez entered a conditional plea of guilty to one count of possession with intent to distribute between 100 and 1,000 kilograms of marijuana, in violation of 21 U.S.C. § 841(a)(1), (b)(1)(B) and 18 U.S.C. § 2. Gonzalez-Rodriguez now appeals the district court's denial of his motion to suppress evidence uncovered during a warrantless search of a tractor-trailer he was driving. We AFFIRM.

---

[*] Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

No. 10-40156

## I. Factual and Procedural Background

On May 19, 2008, Sergeant Robert Morris ("Sergeant Morris"), a narcotics investigator with the Texas Department of Public Safety ("DPS"), was patrolling the Flying J Truck Stop in Edinburg, Texas. Sergeant Morris had worked for DPS for over thirteen years and had joined the narcotics division in 2001. Around lunchtime, Sergeant Morris saw a parked green tractor-trailer with a shirtless driver, later determined to be Defendant-Appellant Julio Antonio Gonzalez-Rodriguez ("Gonzalez-Rodriguez"), sitting in the tractor. Sergeant Morris noticed that the tractor-trailer had Florida license plates and a high United States Department of Transportation ("DOT") number, indicating that the company the tractor-trailer belonged to was newly formed. Additionally, Sergeant Morris noted that the company was identified only by initials.

The trailer was a dry box trailer, meaning that it was not refrigerated. Sergeant Morris observed that the front vent of the dry box trailer had been removed and patched over, there was no back vent, and there was a padlock on the back of the trailer. The patched-over vent seemed suspicious to Sergeant Morris because it was the height of the produce season for watermelons and onions, and if these items were being transported in a dry box trailer, the trailer was required to be ventilated. Furthermore, Sergeant Morris had previously encountered several dry box trailers from Florida that had their vents removed in order to conceal hidden compartments containing controlled substances.

Based on these observations, Sergeant Morris decided to follow the tractor-trailer when it left the truck stop. He saw the tractor-trailer pull over onto the shoulder of the highway and stop behind a green Ford Explorer. He then observed the driver of the tractor-trailer switch places with the passenger in the Explorer. Sergeant Morris followed the tractor-trailer to a rural residence surrounded by a chain link fence, where the tractor-trailer backed into the property. In order to maintain surveillance, Sergeant Morris parked about a

2

No. 10-40156

half mile down the street.  About ten to fifteen minutes later, Sergeant Morris drove by the property and saw a man close the gate to the property.  The man got into a vehicle and followed Sergeant Morris for several miles into a residential area.  Sergeant Morris pulled into the driveway of a house, pretending to live there, and the vehicle continued down the road.

After waiting to make sure that he was not being followed, Sergeant Morris returned to the neighborhood where the tractor-trailer was parked. After some time, Sergeant Morris saw the same vehicle that had followed him approach a nearby intersection. The man looked both ways into the intersection and noticed Sergeant Morris's vehicle. The man then drove to a residence about a house or two from Sergeant Morris's location. Sergeant Morris believed that the vehicle was conducting countersurveillance, i.e., checking to see if anyone was watching or if anyone was in the area who normally would not be there. Sergeant Morris testified that in his experience as a narcotics investigator, it is common for persons in drug transactions to conduct countersurveillance.

After additional personnel arrived to conduct surveillance, Sergeant Morris left the area. At nine or ten o'clock at night, Sergeant Morris drove by the property. He noticed a sport utility vehicle ("SUV") with its doors open parked "kind of close" to the tractor-trailer. At approximately five o'clock the next morning, Sergeant Rodriguez, a DPS narcotics investigator and member of the day-shift surveillance team, saw the tractor-trailer leave the residence. The tractor-trailer drove to the first intersection and pulled to the side of the road, where it was met by the same green Ford Explorer from the previous day. Sergeant Rodriguez saw the passenger in the Ford Explorer and the driver of the tractor-trailer switch places. Sergeant Rodriguez then called Trooper Galindo, who was patrolling with Trooper Manuel Ramon Aranda ("Trooper Aranda"), and asked for assistance in initiating a traffic stop of the tractor-trailer.

3

No. 10-40156

Trooper Aranda, who was driving the patrol car, followed the tractor-trailer and observed that the tractor-trailer failed to drive in a single lane for several seconds. Trooper Aranda pulled over Gonzalez-Rodriguez and mistakenly informed him that he had committed a traffic violation by driving on an improved shoulder. Trooper Aranda obtained Gonzalez-Rodriguez's oral consent to search the trailer, and then after explaining the written consent form to Gonzalez-Rodriguez in Spanish, obtained his written consent. Soon after, Sergeant Morris arrived on the scene and found 529 kilograms of marijuana hidden behind a false plywood wall in the trailer.

On September 9, 2008, a federal grand jury returned a two-count superseding indictment charging Gonzalez-Rodriguez with conspiracy to possess with intent to distribute between 100 and 1000 kilograms of marijuana and possession with intent to distribute between 100 and 1000 kilograms of marijuana. On June 26, 2008, Gonzalez-Rodriguez filed a motion to suppress evidence uncovered during the search of the tractor-trailer.

On June 29, 2009, the district court held an evidentiary hearing on Gonzalez-Rodriguez's motion to suppress. The court heard live testimony from Sergeant Morris and Trooper Aranda and watched a videotape of the traffic stop. After supplemental briefing from both parties, the district court held another hearing—a continuation of the suppression hearing—on October 1, 2009. There, the court issued an oral ruling denying Gonzalez-Rodriguez's motion to suppress. The court found that the troopers did not have probable cause to stop Gonzalez-Rodriguez for a traffic violation. However, the court found that the troopers had reasonable suspicion to stop Gonzalez-Rodriguez based on the collective observations of Sergeant Morris and other narcotics investigators prior to the traffic stop. Furthermore, the court found that Gonzalez-Rodriguez's consent to search was voluntary.

No. 10-40156

Gonzalez-Rodriguez entered a conditional plea of guilty to the possession count, reserving his right to appeal the district court's denial of his motion to suppress. The district court sentenced Gonzalez-Rodriguez to thirty months of imprisonment, followed by a three-year term of supervised release. The court granted the government's motion to dismiss the remaining counts. Gonzalez-Rodriguez timely filed an appeal of the court's denial of his motion to suppress.

## II. Standard of Review

In reviewing a district court's denial of a defendant's motion to suppress, we review the district court's factual findings for clear error and the court's legal conclusions *de novo*. *See United States v. Santiago*, 410 F.3d 193, 197 (5th Cir. 2005). "The district court's overall finding that reasonable suspicion existed for the stop is a conclusion of law that we review *de novo*." *United States v. Rodriguez*, 564 F.3d 735, 740 (5th Cir. 2009) (citation omitted). "We review the evidence in the light most favorable to the prevailing party, which in this case is the government." *Santiago*, 410 F.3d at 197 (citation omitted).

## III. Discussion

The Fourth Amendment provides that "[t]he right of the people to be secure in their persons . . . against unreasonable searches and seizures, shall not be violated[.]" U.S. CONST. amend. IV. It is well established that "stopping an automobile and detaining its occupants constitute a 'seizure' within the meaning" of the Fourth Amendment. *Delaware v. Prouse*, 440 U.S. 648, 653 (1979); *see also United States v. Shabazz*, 993 F.2d 431, 434 (5th Cir. 1993) (citing *Prouse*, 440 U.S. at 653). Under the principles of *Terry v. Ohio*, 392 U.S. 1 (1968), a law enforcement officer may briefly detain a vehicle, consistent with the Fourth Amendment, when the officer has reasonable suspicion that "criminal activity may be afoot." *Id.* at 30; *see also United States v. Ibarra-Sanchez*, 199 F.3d 753, 758 (5th Cir. 1999) (citing *Terry*, 392 U.S. 1). Pursuant to *Terry*, we determine the reasonableness of an investigative stop by examining (1) "whether

the officer's action was justified at its inception" and (2) "whether it was reasonably related in scope to the circumstances which justified the interference in the first place." *Terry*, 392 U.S. at 19-20.

Reasonable suspicion exists when the law enforcement officer can "point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant th[e] intrusion." *Id.* at 21; *see also United States v. Estrada*, 459 F.3d 627, 631 (5th Cir. 2006). In making a reasonable suspicion determination, we "must look at the totality of the circumstances of [the] case to see whether the detaining officer has a particularized and objective basis for suspecting legal wrongdoing." *United States v. Arvizu*, 534 U.S. 266, 273 (2002) (citation and internal quotation marks omitted). We must allow "officers to draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that 'might well elude an untrained person.'" *Id.* (citations omitted). Although an officer cannot base his reasonable suspicion on mere "inarticulate hunches," *Terry*, 392 U.S. at 22, an officer's reasonable suspicion "need not rise to the level required for probable cause, and it falls considerably short of satisfying a preponderance of the evidence standard," *Arvizu*, 534 U.S. at 274 (citation omitted). "Any analysis of reasonable suspicion is necessarily fact-specific," *Ibarra-Sanchez*, 199 F.3d at 759, and "is made by looking at all the circumstances together to weigh not the individual layers but the laminated total." *Id.* at 759 n.5 (citation and internal quotation marks omitted).

In assessing whether there was reasonable suspicion for the investigative stop, "[w]e must consider the collective knowledge and experience of the officers involved." *United States v. Holloway*, 962 F.2d 451, 459 n.22 (5th Cir. 1992). Under the "collective knowledge" doctrine, detaining officers are "not required to have personal knowledge of the evidence that created [the] reasonable suspicion," if they conduct an investigative stop based on the request of officers

No. 10-40156

who do possess a reasonable suspicion of criminal activity. *Ibarra-Sanchez*, 199 F.3d at 759; *see also United States v. Zavala*, 541 F.3d 562, 574 (5th Cir. 2008); *United States v. Ibarra*, 493 F.3d 526, 530 (5th Cir. 2007). Under the "collective knowledge" doctrine, the detaining officers share the investigating officers' reasonable suspicion, and therefore, "[t]he 'collective knowledge' doctrine . . . preserves the propriety of the stop." *Ibarra-Sanchez*, 199 F.3d at 760.

In the instant case, Gonzalez-Rodriguez raises a challenge under the first prong of the *Terry*-stop analysis, which requires that the stop be justified at its inception. Gonzalez-Rodriguez asserts on appeal that the DPS officers did not have reasonable suspicion to stop the tractor-trailer and that the illegal stop tainted his subsequent consent to search the trailer. Considering the totality of the circumstances, we conclude that the district court did not err in finding that the DPS officers had reasonable suspicion that the tractor-trailer was involved in criminal activity.

Gonzalez-Rodriguez argues that Sergeant Morris and Sergeant Rodriguez did not rely on particularized and specific facts necessary to demonstrate that they had reasonable suspicion to justify the stop of the tractor-trailer.[1] We reject Gonzalez-Rodriguez's contention on appeal. In denying Gonzalez-Rodriguez's motion to suppress, the district court set out the articulable and specific facts that formed the basis of the officers' reasonable suspicion.

---

[1] Gonzalez-Rodriguez also argues that the "factors generally present in a case that give rise to reasonable suspicion are not present in this case." Gonzalez-Rodriguez cites *United States v. Rangel-Portillo*, 586 F.3d 376 (5th Cir. 2009), for the proposition that this court must analyze certain factors to determine whether an officer has reasonable suspicion that criminal activity may be afoot. Gonzalez-Rodriguez's argument is misplaced. The case of *Rangel-Portillo* involved a roving border patrol stop, which requires this court to assess the *Brignoni-Ponce* factors. *See id.* at 380; *see also United States v. Soto*, 649 F.3d 406, 409 (5th Cir. 2011). The present case does not involve a roving border patrol stop, and therefore we do not assess the *Brignoni-Ponce* factors. Our reasonable suspicion analysis, as outlined above, is a fact-specific inquiry based on the totality of the circumstances. *See, e.g.*, *Ibarra-Sanchez*, 199 F.3d at 759.

No. 10-40156

The district court, in examining the totality of the circumstances, correctly highlighted Sergeant Morris's extensive law enforcement experience, particularly in narcotics, at the time of the investigatory stop. The Supreme Court and this court have emphasized that in the reasonable suspicion analysis, officers are entitled to rely on their training and experience in order to make inferences and deductions from the information available to them. *See Arvizu*, 534 U.S. at 273; *Terry*, 392 U.S. at 27; *United States v. Brigham*, 382 F.3d 500, 504, 508 (5th Cir. 2004) (en banc) (holding that a police officer had a right to rely on his experience of over five years at DPS in determining that the defendant's "extreme nervousness, his avoidance of eye contact, and his pattern of answering the officer's questions with questions of his own" indicated that he might be lying); *United States v. Grant*, 349 F.3d 192, 198-99 (5th Cir. 2003).

In the instant case, Sergeant Morris had worked for DPS for over thirteen years and had been in its narcotics division for approximately seven years. Sergeant Morris testified that he had experience with several dry box trailers from southern Florida that had their vents removed and patched over in order to conceal false compartments hiding controlled substances. Thus, at the Flying J Truck Stop, Sergeant Morris became suspicious when he saw that the front vent of the dry box trailer had been removed and patched over, the tractor-trailer had Florida license plates, and the tractor-trailer belonged to a newly formed company. Based on his observations of Gonzalez-Rodriguez's tractor-trailer and his experience with such vehicles, Sergeant Morris suspected possible illegal narcotics activity. *Cf. United States v. Banuelos-Romero*, 597 F.3d 763, 767 (5th Cir. 2010) (holding that a trooper, who knew that a particular car make and model had a hidden compartment that could only be accessed by removing the windshield, "had an objective basis for suspecting legal wrongdoing based on the fresh sealant, strong silicone odor, and scarred screws that strongly indicated the windshield had been replaced"*); Estrada*, 459 F.3d at 632 ("[B]ased

8

on [the trooper's] extensive . . . experience, including an occasion at which he found illegal narcotics concealed in a gas tank in similar fashion, he suspected [based on his observations of scratch marks and adhesive] that a false compartment or container was built into the fuel tank to conceal contraband.").

In its reasonable suspicion analysis, the district court noted several additional articulable facts that informed the officers' reasonable suspicion. Sergeant Morris noticed the driver of the tractor-trailer switch places with the passenger of the Ford Explorer, and then he observed the tractor-trailer park at a rural residence with a gated chain link fence.[2] Next, Sergeant Morris testified that he was followed for several miles by a vehicle that had left the rural residence and that he saw the same vehicle approach an intersection near where he was parked later that day. Sergeant Morris testified that, to him, it appeared that the vehicle was conducting countersurveillance, a common practice among persons involved in drug trafficking, which heightened his suspicion. *See United States v. Posada-Rios*, 158 F.3d 832, 868 n.15 (5th Cir. 1998) ("Use of counter-surveillance techniques by suspects raises a reasonable suspicion."). Furthermore, the following morning, Sergeant Rodriguez noticed the driver of the tractor-trailer switch places with the passenger of the Ford Explorer.

Contrary to Gonzalez-Rodriguez's assertion, the DPS officers, and the district court in its reasonable suspicion analysis, did rely on specific and articulable facts indicative of criminal activity. These particularized facts include the dry box trailer's removed and patched-over vent, which was consistent with the creation of a hidden compartment; the tractor-trailer's

---

[2] Gonzalez-Rodriguez correctly points out that the district court erred when it found that the tractor-trailer's doors were open when the tractor-trailer was parked near the SUV at the rural residence. Sergeant Morris actually testified that he saw an SUV with its doors open parked "kind of close" to the truck. However, even taking this fact out of the reasonable suspicion analysis, there is sufficient particularized evidence to support the district court's conclusion that the officers had reasonable suspicion to justify the stop of the tractor-trailer.

No. 10-40156

Florida license plates and the company's high DOT number; the switching of drivers; and the existence of countersurveillance. Taken together with Sergeant Morris's experience and in light of the totality of the circumstances, these specific and articulable facts demonstrate that the DPS officers had reasonable suspicion that the tractor-trailer was engaged in criminal activity.[3] *See Ibarra-Sanchez*, 199 F.3d at 759 ("Any analysis of reasonable suspicion is necessarily fact-specific, and factors which by themselves may appear innocent, may in the aggregate rise to the level of reasonable suspicion.") (citations omitted); *see also Estrada*, 459 F.3d at 632. Therefore, the investigative stop of the tractor-trailer did not violate Gonzalez-Rodriguez's Fourth Amendment rights.

Because we hold that the investigatory stop was constitutional, Gonzalez-Rodriguez's argument that his consent to search the trailer was tainted by the illegal stop necessarily fails. *See Brigham*, 382 F.3d at 512 ("Absent a Fourth Amendment violation, [the defendant's] consent to search the vehicle was not unconstitutionally tainted.") (citation omitted).

## IV. Conclusion

For the foregoing reasons, we AFFIRM the judgment of the district court.

---

[3] As explained above, Troopers Aranda and Galindo, who made the stop of Gonzalez-Rodriguez's tractor-trailer, were not required to have personal knowledge of the evidence supporting reasonable suspicion. Because the troopers acted upon the request of Sergeant Rodriguez, the troopers shared in Sergeant Morris and Sergeant Rodriguez's reasonable suspicion under the "collective knowledge" doctrine. *See Ibarra-Sanchez*, 199 F.3d at 759.