**UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT**

_____

**No. 98-60243**
_____


**UNITED STATES OF AMERICA,**

**Plaintiff-Appellee,**

**v.**

**BILLY LEON CAMPBELL,**

**Defendant-Appellant.**

_____

**Appeal from the United States District Court
for the Northern District of Mississippi**
_____

**June 10, 1999**

Before JONES and STEWART, Circuit Judges, and DUPLANTIER,[*] District
Judge.

EDITH H. JONES, Circuit Judge:

Campbell pled guilty to armed bank robbery, use of a
firearm during and in relation to a crime of violence, and two
counts of obstruction of commerce by robbery, on the condition that
he could challenge the district court's denial of his motion to
suppress evidence. On appeal, he argues that there were
insufficient grounds for an investigatory detention and its
successive steps: being told to lie prone, being handcuffed, being
frisked, and having several objects removed from his pocket.
Alternatively, he argues that his detention constituted an arrest

_____

[*]District Judge of the Eastern District of Louisiana, sitting
by designation.

unsupported by probable cause.  We conclude that, under the circumstances, the officers' conduct was reasonable.

## I.

On the morning of July 31, 1997, a lone black male robbed a bank in Olive Branch, Mississippi.  In the course of the robbery, he pointed a handgun at the teller whom he asked for money.  The robber was described as being in his twenties or early thirties, about 6'1" tall, 155 pounds, with long hair and a dark complexion.  He escaped with $3,365 in what witnesses described as a late 1980s, black Chevrolet Cavalier with Tennessee license plate 600TTP.

The next day, FBI agent Lent Rice learned from Memphis police that the license plate had expired, and that the person to whom it had last been registered said it was now in the possession of Michael Campbell (the defendant's brother), who lived at 4544 Fontaine Place, in Olive Branch.  At about 5:00 P.M., Agent Rice went to that address with Detective Cleates Oliver of the Olive Branch Police Department.  When they arrived, they saw the Cavalier with the same Tennessee license plate parked in the carport next to the house.  They set up surveillance a block away and called for backup.  Sergeant Scott Gentry arrived to assist in the surveillance.  He was told that they were surveilling a possible armed robbery suspect who was armed, given the description of the robber, told that the car in the carport was the getaway vehicle, and told that Michael Campbell was the suspect.

Within minutes, three black males emerged from the house and appeared to be getting into the car.  The surveilling officers moved in to stop their departure.  Sergeant Gentry got to the

**2**

driveway first.  By then, Michael Campbell and another man were already in the car.  Billy Campbell was still walking towards the driver's side of the car.  With his gun drawn, Gentry ordered all three men to put their hands up.  Moving towards Billy Campbell, Gentry told him to get on the ground.  As Campbell did this, Gentry looked to the two men in the car and told them to keep their hands visible.  When Agent Rice and Detective Oliver approached the men in the car, Gentry turned his attention back to Billy Campbell, who had complied with his order to lie down on the concrete surface of the carport.

Billy Campbell matched the description of the bank robber: he was 24 years old, 6'1" tall, 160 pounds, with a dark complexion and shoulder-length hair.  Gentry considered this a high-crime neighborhood and noted that there were people in nearby yards, as well as two women and a small child under the carport.  Gentry holstered his weapon, handcuffed Campbell behind his back, and frisked him.  Gentry ran his hands along Campbell's body, and around the waistband, rolling Campbell to the left and right side to frisk his pockets.  In Campbell's right front pants pocket, Gentry felt a large bulge.  Fearing that it might be "some type of weapon," Gentry called Detective Oliver over.  Gentry then reached into the pocket, pulled its contents out, and laid them on the ground.  The contents comprised a large wad of money (more than $1,400), a gold cardboard jewelry box containing a gold chain, and some change.

Meanwhile, Agent Rice had been dealing with Michael Campbell.  Rice asked Michael Campbell to get out of the car and

immediately handcuffed him, placed him on the ground, and frisked him. (Detective Oliver asked the third man, who was too short to meet the bank robber's description, to get out of the car and sit down on the carport's concrete surface.) Michael Campbell told Rice that he had been in jail the previous day. Someone contacted the DeSoto County Sheriff's Department, which confirmed within 10 to 25 minutes that Michael Campbell had been in their custody at the time of the bank robbery. Michael Campbell's handcuffs were removed.

During the time that Michael Campbell's alibi was being checked, Detective Oliver took the items from Billy Campbell's pocket to his car. Within a few minutes, Assistant Police Chief Hal Pino arrived. Pino checked the $20 bills and found that three of them matched the serial numbers on the list of "bait bills" that the bank teller had given the robber. During the time it took to check the bills, Billy Campbell was left handcuffed.[1] After the bait bills had been identified and Michael Campbell's alibi was confirmed, Billy Campbell was told he was being held on suspicion of bank robbery, taken to a squad car, and advised of his rights.

Billy Campbell later confessed to the bank robbery as well as several other armed robberies in the area in the weeks before the bank robbery. A consent search of the house on Fontaine Place (which was owned by the Campbells' mother) revealed a hardhat, goggles, and plastic hair net matching those worn by the

---

[1]It is unclear from the record and the briefs whether Campbell was lying down or standing up while the bills were checked.

bank robber.  Mrs. Campbell later located the handgun that had been used in the string of robberies and turned it over to the police.

Before trial, Campbell moved to suppress the physical evidence obtained from the stop.  After a hearing where three of the officers testified, the district court denied the motion to suppress, finding that the officers had reasonable suspicion to detain the men getting into the car, that their conduct was reasonable under the circumstances, and that it did not exceed the bounds of an investigative detention.

## II.

The "reasonableness of an investigatory stop and frisk" is reviewed de novo.  United States v. Michelletti, 13 F.3d 838, 841 (5th Cir. 1994) (en banc).  Yet the evidence is reviewed "in the light most favorable to the government as the prevailing party," and the denial of the motion to suppress will be upheld "if there is any reasonable view of the evidence to support it."  Id. (internal quotation omitted).

## III.

There is no doubt that the officers had reasonable suspicion to make an investigatory stop of Campbell.  "[I]f police have a reasonable suspicion, grounded in specific and articulable facts, that a person they encounter was involved in or is wanted in connection with a completed felony, then a Terry stop may be made to investigate that suspicion." United States v. Hensley, 469 U.S. 221, 229, 105 S. Ct. 675, 680 (1985).  Campbell matched the physical description of the bank robber from the day before and was approaching a car that matched a detailed description of the

getaway vehicle and bore the same license plate.  These facts were sufficient to warrant further investigation.

In the course of that investigation, the officers had two goals: to investigate and to protect themselves during their investigation.  See Terry v. Ohio, 392 U.S. 1, 23, 88 S. Ct. 1868, 1881 (1968) ("[I]n addition [to the governmental interest in investigating crime], there is the more immediate interest of the police officer in taking steps to assure himself that the person with whom he is dealing is not armed with a weapon that could unexpectedly and fatally be used against him.").  The officers were authorized to "take such steps as were reasonably necessary to protect their personal safety and to maintain the status quo during the course of the stop."  Hensley, 469 U.S. at 235, 105 S. Ct. at 684.  This court asks case-by-case "whether the police were unreasonable in failing to use less intrusive procedures to conduct their investigation safely."  United States v. Sanders, 994 F.2d 200, 206-07 (5th Cir. 1993).

In Sanders, this court observed that "using some force on a suspect, pointing a weapon at a suspect, ordering a suspect to lie on the ground, and handcuffing a suspect -- whether singly or in combination -- do not automatically convert an investigatory detention into an arrest requiring probable cause."  Id. at 206. Although there are some differences between this case and the facts of Sanders -- here there was no sign of non-cooperation and the stop happened about 30 hours after the bank robbery -- that does not mean that the use of drawn guns and handcuffs was unreasonable. As the Seventh Circuit has noted: "When a suspect is considered

**6**

dangerous, requiring him to lie face down on the ground is the safest way for police officers to approach him, handcuff him and finally determine whether he carries any weapons." United States v. Tilmon, 19 F.3d 1221, 1228 (7th Cir. 1994).

This is precisely what Sergeant Gentry did. Given that Billy Campbell matched the description of the armed bank robber and was walking towards the driver's side of what almost certainly had been the getaway vehicle, there were good reasons to assume that Campbell was armed. See Terry, 392 U.S. at 24, 88 S. Ct. at 1883 ("An officer need not be certain that an individual is armed...."); Tilmon, 19 F.3d at 1227 (citing six cases finding it reasonable to assume armed bank robbery suspects are dangerous). Although Campbell had complied with Gentry's order to lie down, this would not have precluded his reaching for a weapon. There were other people in the area and only three officers to control all three suspects. Under the circumstances, it was not unreasonable for Gentry to take the precaution of handcuffing Campbell and frisking him. Nor was it unreasonable, as Campbell alleges, to handcuff him before frisking him. See Sanders, 994 F.2d at 208-09.

Campbell argues that the removal of his pocket's contents was unreasonable because the frisk revealed nothing that could "be taken for a weapon by an experienced officer under any stretch of the imagination." This ipse dixit is inadequate to reverse the district court. Gentry testified that he thought the large bulge in Campbell's pocket "was some type of weapon." The combination of change, over $1,400 of currency, and a cardboard box containing a gold chain was no mere "bump." Cf. United States v. Ponce, 8 F.3d

**7**

989, 999 (5th Cir. 1994) ("a police officer's protective search might properly include seizure of an object that feels like a wad of folded bills concealing a weapon"). In the light most favorable to the government, Gentry had not ruled out the possibility that the large bulge was a weapon, and his removal of the pocket's contents was not beyond the scope of a permissible <u>Terry</u> frisk.

Finally, Campbell argues that the totality of the officers' conduct constituted an arrest, rather than an investigatory stop, and was unsupported by probable cause. As discussed above, drawn guns and handcuffs do not necessarily convert a detention into an arrest. Nor did it convert the detention into an arrest to leave Billy Campbell handcuffed during the time it took to investigate Michael Campbell's alibi and the serial numbers on the $20 bills. As the Supreme Court has explained:

> In assessing whether a detention is too long in duration to be justified as an investigative stop, we consider it appropriate to examine whether the police diligently pursued a means of investigation that was likely to confirm or dispel their suspicions quickly, during which time it was necessary to detain the defendant.

<u>United States v. Sharpe</u>, 470 U.S. 675, 686, 105 S. Ct. 1568, 1575 (1985). There were substantial reasons to suspect Billy Campbell had been the bank robber, and he was detained for no longer than necessary to conduct a cursory check that could provide more conclusory evidence.[2] The entire detention took between 10 and 25

---

[2]Michael Campbell's handcuffs were removed as soon as his alibi was confirmed. The third man present was never handcuffed because he was too short to match the description of the bank robber.

minutes -- not an unreasonable amount of time under the circumstances.  See id. at 688, 105 S. Ct. at 1576 (20-minute stop not an arrest); Allen v. City of Los Angeles, 66 F.3d 1052 (9th Cir. 1995) (detention of suspect in police car for 24 minutes, while police contacted car owner to determine if it had been stolen, did not amount to an arrest); Courson v. McMillian, 939 F.2d 1479, 1492 (11th Cir. 1991) (30-minute detention not unreasonable for an investigative stop).

The facts of this case demonstrate neither an arrest nor unreasonably excessive steps for an investigatory detention.

## IV.

Because the district court did not err in denying Campbell's motion to suppress, Campbell's convictions on all counts are AFFIRMED.

**AFFIRMED.**