**UNITED STATES of America**

v.

**Javier MALDONADO.**

**No. CRIM. NO. L–01–1101.**

United States District Court,
S.D. Texas,
Laredo Division.

Jan. 8, 2002.

Javier Maldonado, In Custody, pro se.

Carlos David Castillon, Freeman & Castillon, Laredo, TX, Albert M. Gutierrez, Jr., Alvarez Notzon, et al., San Antonio, TX, for Javier Maldonado.

Patricia Rosalinda Suzan–De La Torre, In Custody, pro se.

Eduardo Jaime, Attorney at Law, Laredo, TX, for Patricia Rosalinda Suzan–De La Torre.

Juan Maldonado–Juarez, In Custody, pro se.

Alonzo Ramos, Attorney at Law, Laredo, TX, for Juan Maldonado–Juarez.

Pretrial Services—LA, Laredo, TX, U.S. Probation, Laredo, TX, Financial Litigation, U.S. Attorney's Office Southern District of Texas, Houston, TX, James Mack Noble, IV, U.S. Attorney's Office, Laredo, TX, for U.S.

### MEMORANDUM AND ORDER

KAZEN, Chief Judge.

On October 22, 2001, Defendant filed a Motion to Suppress, challenging the legality of the stop of a vehicle in which he was traveling and the voluntariness of his consent to search his residence. (Docket No. 14). On December 10, 2001, a hearing was held on the motion. At the conclusion of the hearing, the Court invited the parties to submit further arguments in writing.

Both parties have responded. (Docket Nos. 34, 35, 37).

### I. *Statement of Facts*

On September 19, 2001, Juan Maldonado–Juarez (Juarez) and Patricia Rosalinda Suzan de la Torre (Patricia) entered the United States by crossing the Lincoln–Juarez Bridge II, Laredo, Texas, in a blue BMW. Based on the initial conversation with a United States Customs Agent, the vehicle was diverted to secondary inspection. A canine inspection of the vehicle resulted in a positive alert for the presence of a controlled substance. A search of Patricia's person revealed two bundles of cocaine strapped to her body. In a subsequent interview with Customs Agents, Juarez admitted being involved in the smuggling of the cocaine. He further stated that the plan was to deliver the cocaine to people named Javier and Juan, to whom he had made approximately fifteen (15) prior deliveries, after calling them at a cell phone number he had in his possession. Juarez gave a physical description of Javier and Juan. He also described the gas station where he had delivered to them in the past, and two houses to which he had followed them after a previous delivery. Juarez pointed out the location of these houses on a map, and stated that he was willing to cooperate to further the investigation.

Due to a shortage in available personnel right after the terrorist attacks of September 11, the Customs Agents requested assistance from the Laredo Task Force on narcotics. Task Force Agent Jose Benavides proceeded to the location indicated by Juarez on the map, and established surveillance. Soon thereafter, several Customs Agents, including Agent Adrian Flores, and Juarez drove past the houses and continued around the block. The house at 3304 San Francisco Street matched Juarez's previous description of

the house he had seen Javier and Juan enter, and Juarez confirmed that this was the correct location. As they approached the houses a second time, a green Ford Contour that had not been there during the previous drive-by was parked in front of one of the houses, at 3304 San Francisco. There were two men in the Contour. Juarez stated that he recognized the car and the two men from previous deliveries. He identified one of the men as Juan. While Juarez and the agents were observing the scene and preparing to make a monitored phone call from Juarez to Javier, a man carrying a bag walked from the house to the car. Juarez stated that this individual was Javier, who was later identified as Javier Maldonado (Defendant). Agent Flores testified that the manner in which Defendant was carrying the bag made him suspect that the bag contained drugs. Defendant got into the Ford Contour with the others, and the car drove away. Not wanting to lose any evidence that might have been contained in the bag, and wanting to confirm the identity of the individuals in the Contour, Agents Flores and Benavides coordinated a stop of the vehicle. At the request of Agent Benavides, an officer of the Laredo Police Department stopped the Contour. The officer ordered the three men out of the vehicle at gunpoint, and instructed them to get down on their knees. After ascertaining the identities of the three men, the officer had Defendant sit in the back seat of his patrol car, with the door open. When Customs Agents brought Juarez to the scene, he identified the three men as Humberto Miranda, Javier, and Juan. A consent search was performed on the vehicle,[1] uncovering two scales covered with a white powdery residue, which later tested positive for cocaine, located in the bag that Defendant had carried from his house to the car. When Agent Benavides ar-

rived, he and Agent Rocha spoke to Defendant. Defendant stated that the bag was his. Agent Rocha informed Defendant that the officers wanted to go back and search his residence at 3304 San Francisco, and Defendant gave oral consent to do so. At that time, no one was pointing a gun at Defendant, and he was not in handcuffs. Agent Benavides notified Agent Flores, who had returned to the house, that Defendant had given oral consent to search the house, but that they had no written consent form for him to sign. Defendant was then transported back to the house, as Juan and Humberto followed in the Contour.

When they arrived at the house, Agent Flores approached Defendant and stated that he was told that Defendant had given oral consent to search the house. Defendant said that he had, and informed Agent Flores that he was the owner of the house. Agent Flores proceeded to show Defendant a written consent form. Because the form was written in English, and Defendant does not speak or read English, Agent Flores explained the form to Defendant in Spanish. Agent Flores informed Defendant that he was not required to sign the form, and told Defendant that anything that was found in the house could be used against him in court. Defendant then signed the consent form, and opened the house for the agents to search. The search uncovered cocaine, firearms, and United States currency.

## II. *Stop of Vehicle*

▮ Defendant contends that the stop of the Ford Contour was illegal because it was performed without probable cause or a warrant. The Fourth Amendment protects against unreasonable government seizures of persons or property. *See* U.S. CONST. amend. IV. There is no question

---

**1.** The validity of this particular search has not been challenged.

that Defendant was seized when the Ford Contour was stopped. *See United States v. Jones,* 234 F.3d 234, 239 (5th Cir.2000). The question, therefore, is whether that seizure was unreasonable. Seizures of motorists who are suspected of criminal activity are analyzed under the framework for investigative detentions established by the Supreme Court in *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). *See United States v. Shabazz,* 993 F.2d 431, 434–35 (5th Cir.1993). The Court must engage in a dual inquiry: 1) whether the officer's action was justified at its inception; and 2) whether the stop was reasonably related in scope to the circumstances that justified the initial interference. *See Jones,* 234 F.3d at 240.

 The stop was justified at its inception if law enforcement officers had a reasonable suspicion, grounded in specific and articulable facts, that the person stopped was involved in illegal activity. *See id.* at 239; *United States v. Campbell,* 178 F.3d 345, 348 (5th Cir.1999). During their interview of Juarez after his arrest at the bridge, the agents learned that Juarez had delivered cocaine to people named Javier and Juan on approximately fifteen prior occasions, and that Juarez was to deliver his current load of cocaine to those same individuals. Juarez showed the agents on a map where Javier and Juan lived. When the agents took Juarez to that location, he identified 3304 San Francisco as one of the houses that he had seen Javier and Juan enter in the past. Juarez then identified one of the men in the Ford Contour as Juan, and the man carrying the bag to the car as Javier. The basis of an informant's knowledge is a relevant factor in assessing his reliability. *See United States v. McWaine,* 243 F.3d 871, 874 (5th Cir.2001). Moreover, an informant's reliability is significantly enhanced if the information he provided was against his own penal interest. *See United States v. Shugart,* 117 F.3d 838, 844 (5th Cir.1997). All

of the information provided by Juarez was based on his personal knowledge from prior drug deliveries to Javier and Juan. Based on those facts, the agents had ample grounds to believe that at least two of the three men in the Contour were involved in an ongoing conspiracy to distribute cocaine. Thus, it was reasonable for them to stop the car to conduct a further investigation.

 The permissible scope of an investigative detention is defined by its purpose. *See Shabazz,* 993 F.2d at 437. The purpose of the stop of the Contour was to confirm the identities of the men in the car, to investigate the contents of the bag Defendant had carried, and to attempt to obtain consent to search Defendant's residence. Those objectives were achieved in an expeditious manner. Once Defendant gave oral consent to search his house, it was reasonable to transport him to that location so that he could sign a written consent form and be present for the search. Approximately twenty (20) minutes elapsed from the time that the Contour was stopped to the signing of the consent form. The officer's removal of the occupants from the vehicle at gunpoint and his request that they get on their knees did not exceed the scope of the detention. *See Maryland v. Wilson,* 519 U.S. 408, 117 S.Ct. 882, 886, 137 L.Ed.2d 41 (1997) (holding that it is permissible for an officer to order the occupants out of a vehicle during a lawful stop); *Campbell,* 178 F.3d at 349 (stating that pointing a weapon at a suspect and ordering him to the ground does not automatically convert a stop into an arrest requiring probable cause). During an investigative detention, officers are authorized to take steps necessary to protect their personal safety. *See id.* at 348–49. "[T]he fact that there is more than one occupant of the vehicle increases the possible sources of harm to the officer." *See*

*Wilson,* 117 S.Ct. at 885. At the time the Laredo police officer stopped the car, he was the only law enforcement officer on the scene, faced with the detention of three adult males.

 Furthermore, although the relevant standard is only reasonable suspicion, the Court finds that under the circumstances the agents had probable cause to believe Defendant was involved in cocaine trafficking before the vehicle was stopped. Therefore, although they did not in fact do so, they were authorized to arrest Defendant without first seeking a warrant. *See United States v. Garcia,* 179 F.3d 265, 268 (5th Cir.1999) (stating that an officer may make a warrantless arrest in a public place if he has probable cause to believe the suspect has committed a felony); *Fontenot v. Cormier,* 56 F.3d 669, 674 (5th Cir.1995) (same). Even if probable cause did not exist before the stop, it surely arose at the moment the scales covered with cocaine residue were discovered in a bag that Defendant admitted belonged to him. *See United States v. Ervin,* 907 F.2d 1534, 1540 (5th Cir.1990) (stating that although the initial stop is justified by only reasonable suspicion, additional facts gathered during the stop may strengthen the officers' level of suspicion into probable cause). Thus, any further detention of Defendant after that point was reasonable.

### III. *Consent to Search Residence*

 There is no question that Defendant consented to a search of his house. He testified that he gave his oral consent to search his residence when asked by the agents, both at the scene of the vehicle stop and in front of his house. He also signed a written consent form before the agents entered his house. To be valid, however, consent must be given voluntarily. The voluntariness of one's consent is determined by analyzing six factors: 1) the voluntariness of the defendant's custodial status; 2) the presence of coercive police procedures; 3) the extent and level of the defendant's cooperation with the police; 4) the defendant's awareness of his right to refuse consent; 5) the defendant's education and intelligence; and 6) the defendant's belief that no incriminating evidence will be found. *See Jones,* 234 F.3d at 242. No single factor is dispositive. Rather, the ultimate determination of voluntariness is based on the totality of the circumstances. *See id.; United States v. Gonzales,* 79 F.3d 413, 421 (5th Cir.1996).

The first and sixth factors appear to weigh in Defendant's favor. As stated above, Defendant was detained when the car in which he was traveling was stopped. Under the circumstances, a reasonable person would not have felt free to ignore the law enforcement officers and go about his business. Moreover, based on the evidence located in Defendant's house, it is unlikely that he believed that no incriminating evidence would be found. However, the remaining factors all weigh in favor of voluntary consent.

First, the officers did not employ coercive procedures to obtain Defendant's consent. At the time he gave his initial oral consent, he was sitting in the back seat of a Laredo police car, with the door open, talking to Agents Benavides and Rocha. When he signed the written consent form, he was standing in front of his house, speaking to a single Customs Agent. Although the form was written in English, Agent Flores explained its content to Defendant in Spanish. Defendant was not handcuffed at any time. Second, Defendant cooperated with the officers during the entire encounter. He willingly answered questions at the scene of the vehicle stop, he signed the consent form, and he opened his house for the agents after signing the form. Third, Defendant was aware of his right to refuse consent.

Agent Flores advised him of that right as he was explaining the consent form to Defendant. Finally, Defendant's testimony demonstrated that he had sufficient education and intelligence to understand what he was doing when he consented to the search. Under the totality of the circumstances, the Court finds that Defendant's consent was voluntary.

## IV. *Miranda*

Defendant argues that he "was in custody when the agents began to question him about obtaining consent to search his home but had not been given his Miranda warnings as required by law which precludes the introduction into evidence of any statements made by [him] concerning consent to search his home." (Docket No. 34). For *Miranda* to be implicated, there must be custodial interrogation. *See United States v. Gonzales*, 121 F.3d 928, 939 (5th Cir.1997). A suspect is in "custody" for *Miranda* purposes when placed under formal arrest, or when a reasonable person in the suspect's situation would believe that his freedom of movement was restrained to the degree the law associates with formal arrest. *See id.* at 939 n. 6; *United States v. Hurtado*, 899 F.2d 371, 375 (5th Cir.1990). Defendant was not "in custody" at the time he gave consent to search his house. His initial oral consent was given during the stop of the Ford Contour. Traffic stops are typically non-custodial due to their short duration and public character. *See Berkemer v. McCarty*, 468 U.S. 420, 104 S.Ct. 3138, 3149, 82 L.Ed.2d 317 (1984); *United States v. Galberth*, 846 F.2d 983, 993 n. 19 (5th Cir. 1988). Once Defendant consented to a search of his home, the encounter was extended only to transport him to that location so that he could sign a written consent form. Defendant was never placed in handcuffs, was never told that he was under arrest or could not leave, and was not coerced in any way. Thus, although he was detained, Defendant was never in "custody" for purposes of *Miranda* before he gave consent to search his home.

Furthermore, Defendant was not interrogated. "Interrogation" for purposes of *Miranda* means conduct or questioning "that the police should know is reasonably likely to evoke an incriminating response from a suspect." *Rhode Island v. Innis*, 446 U.S. 291, 100 S.Ct. 1682, 1690, 64 L.Ed.2d 297 (1980); *Gonzales*, 121 F.3d at 940 n. 7. The only response that the agents were seeking from Defendant was his consent to search his home. Defendant cites no authority, and the Court has found none, to support the proposition that merely seeking consent to search is "interrogation." To the contrary, the Seventh Circuit has plainly stated that "a request for consent to search is not interrogation." *See United States v. LaGrone*, 43 F.3d 332, 339 (7th Cir.1994). Giving consent to search is not, by itself, an incriminating response. Only if the search uncovers contraband or evidence of criminal activity is the suspect incriminated. Thus, it is the search and not the consent that bears the potential for incriminating the suspect.

"Fidelity to the doctrine announced in *Miranda* requires that it be enforced strictly, but only in those types of situations in which the concerns that powered the decision are implicated." *Berkemer*, 104 S.Ct. at 3148–49. This is simply not one of those situations. Defendant was neither in custody nor being interrogated at the time he gave his consent to search his home.

## CONCLUSION

For the foregoing reasons, Defendant's motion is **DENIED**.