# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

No. 15-30351

United States Court of Appeals
Fifth Circuit

**FILED**

August 10, 2016

Lyle W. Cayce
Clerk

UNITED STATES OF AMERICA,

Plaintiff–Appellee,

versus

GIE PRESTON, Also Known as Gie Z. Preston, Also Known as G. Preston;
BURNELL ALLEN, Also Known as Baldy Allen;
SONNY ALLEN, Also Known as Shortbread Allen,

Defendants–Appellants.

Appeals from the United States District Court
for the Eastern District of Louisiana
USDC No. 2:12-CR-138-1

Before HIGGINBOTHAM, SMITH, and OWEN, Circuit Judges.

JERRY SMITH, Circuit Judge:*

The three defendants were convicted for participation in a drug-

---

* Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

No. 15-30351

distribution conspiracy. Gie Preston appeals the denial of a motion to suppress and the sufficiency of the evidence. Sonny Allen ("Sonny") appeals only the sufficiency of the evidence supporting his conviction of conspiracy to distribute and to possess with intent to distribute cocaine base ("crack"). Burnell Allen ("Burnell") contests the district court's conflict-of-interest analysis as to his trial counsel. We find reversible error solely as to Preston's conviction of conspiracy to possess firearms in furtherance of a drug-trafficking offense. We reverse that conviction and otherwise affirm as to all defendants.

I.

The defendants are members of the same extended family who engaged in a years-long crack-distribution conspiracy from their grandmother's house in New Orleans. They would lounge on the porch and take turns walking, often with firearms, along the sidewalk to engage in hand-to-hand transactions with customers. Each stored his cash and crack, which they otherwise did not share, in separate but proximate places in the backyard. They sometimes pooled their money to purchase more crack to sell or cocaine powder that they would cook for sale as crack.

The defendants were indicted, along with others,[1] on various charges related to the conspiracy. They proceeded to a joint trial at which the government offered testimony of sixteen witnesses and physical evidence of the conspiracy. Each defendant moved unsuccessfully for acquittal after the prosecution's case but offered no witnesses. The jury found each guilty of conspiring to distribute and possess with intent to distribute 280 grams or more of crack

---

[1] Also indicted were the defendants' family members Lionel and Eugene Allen and their friends, Emanuel Casame and Mark Rayfield—all of whom pleaded guilty. Eugene, Rayfield, and Casame ultimately testified for the government.

No. 15-30351

in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(A) and 846 (Count One).[2]

## II.

## A.

Preston and Sonny take issue with the sufficiency of the evidence supporting their conspiracy convictions. "[W]e review de novo the district court's denial of [their Federal Rule of Criminal Procedure] 29 motion for a judgment of acquittal." *United States v. Mitchell*, 484 F.3d 762, 768 (5th Cir. 2007). "[W]e view the evidence and the inferences drawn therefrom in the light most favorable to the verdict, and we determine whether a rational jury could have found the defendant guilty beyond a reasonable doubt." *Id.* We accord equal weight to direct and circumstantial evidence, and "the evidence need not exclude every reasonable hypothesis of innocence." *United States v. Gonzales*, 79 F.3d 413, 423 (5th Cir. 1996).

To prove a conspiracy, the government must show "(1) an agreement existed between two or more persons to violate federal narcotics law, (2) the defendant knew of the existence of the agreement, and (3) the defendant voluntarily participated in the conspiracy." *United States v. Ochoa*, 667 F.3d 643, 648 (5th Cir. 2012). "No evidence of overt conduct is required. A conspiracy agreement may be tacit, and the trier of fact may infer agreement from circumstantial evidence." *United States v. Thomas*, 12 F.3d 1350, 1356 (5th Cir. 1994) (quotations omitted). "An agreement may be inferred from concert of action, voluntary participation may be inferred from a collection of

---

[2] As relevant here, the jury also found Preston guilty of: conspiring to possess firearms in violation of 18 U.S.C. § 924(o) (Count Two); being a felon in possession of a firearm in violation of 18 U.S.C. §§ 922(g)(1) and 924 (a)(2) (Counts Four, Seven, and Ten); possessing with intent to distribute crack in violation of 21 U.S.C. § 841(a)(1), (b)(1)(C) (Count Six); possessing a firearm in furtherance of a drug crime in violation of 18 U.S.C. § 924(c)(1)(A) (Count Eight); and, using a telephone in furtherance of a drug crime in violation of 21 U.S.C. § 843(b) and 18 U.S.C. § 2 (Count Nine).

No. 15-30351

circumstances, and knowledge may be inferred from surrounding circumstances." *United States v. Grant*, 683 F.3d 639, 643 (5th Cir. 2012).

Preston and Sonny maintain the evidence showed only "conscious parallelism" between an "uncoordinated group of loosely connected people" who sold drugs in an area where such transactions are common. Although, as they suggest, "mere presence or association alone are not sufficient to support a conspiracy conviction,"[3] there is evidence from which a rational jury could infer more than mere presence.

Police Officer Brian Pollard testified that, while he was assigned as a liaison officer to a housing development across the street from the grandmother's house, he witnessed Preston and Sonny engaging in "hand-to-hand transactions . . . five to seven days a week from sunup to sundown." The defendants sold drugs while "physically close together" and "would sit on the porch together, talk together, ride in vehicles together, [and] walk together." Eugene Allen (a cousin and indicted co-conspirator) testified that he, Preston, and Sonny sold crack from the house. Isaac Thompson (a purchaser), Emanuel Casame (an indicted co-conspirator), and Mark Rayfield (an indicted co-conspirator) testified that they saw all three defendants selling crack there. Nukema Frith (a purchaser) and Brandy Dwyer (a purchaser) testified that they bought crack from Sonny and Preston at the house.

Although the defendants did not explicitly agree to sell together and did not share profits, and one co-conspirator testified he was "hustling for [him]-self," the jury was entitled to weigh the remaining evidence. For example, Rayfield and Casame testified that Sonny and Preston stored their cash and

---

[3] *United States v. Holloway*, 377 F. App'x 383, 385 (5th Cir. 2010) (citing *United States v. Brito*, 136 F.3d 397, 409 (5th Cir. 1998)).

4

drugs in the grandmother's backyard. Casame also said that "every time [the defendants] g[o]t ready to re-up" between 2007 and 2011 they would pool their money. Moreover, Dwyer testified that the defendants sold crack at the same time in front of the house, and Frith stated that they never competed for a sale. Finally, Casame and Rayfield testified that Burnell, Sonny, and Preston would sell or give crack to each other. Based on the foregoing, non-exhaustive evidence—including the "significant factor" of their mutual presence and the "context of the circumstances under which it occur[ed]"[4]—a rational jury could have found all three guilty of conspiracy beyond a reasonable doubt.[5]

Defendants contend as well that the evidence was insufficient to prove the conspiracy involved more than 280 grams of crack. That claim is meritless. Isaac Thompson testified that he sold them "a half ounce"[6] of powder cocaine

---

[4] *I.e.*, taking turns for sales, no competition, pooling money, and proximately stashing crack and money. *United States v. Quiroz-Hernandez*, 48 F.3d 858, 866 (5th Cir. 1995).

[5] Sonny's reference to *Holloway* is inapposite. There, the defendant was charged as a minor participant in a drug-distribution conspiracy based on evidence that he sold crack in an area "known for its high volume of crack cocaine trafficking." *Holloway*, 377 F. App'x at 384. Though some witnesses testified that Holloway and other dealers took turns and that Holloway sometimes bought crack from them, we reversed. *Id.* at 388. The case is distinguishable because there was no evidence that Holloway pooled his money with other co-conspirators, that he stashed his drugs close to other dealers' stashes, that he was related to other sellers, that any people who sold him crack knew he would resell it, and, in addition to that lack of testimony, five of the government's eleven witnesses testified they did not know of Holloway (or did not mention him at all). *See id.* at 385–86. The evidence against Sonny and Preston plainly is more substantial.

That same evidence disposes of defendants' claims that there was a material variance between the specific conspiracy alleged in the indictment and the multiple conspiracies proven at trial. Assuming *arguendo* that a variance occurred, we do not reverse, because the government proved beyond a reasonable doubt each defendant's participation in at least one conspiracy, so the variance did not affect substantial rights. *Mitchell*, 484 F.3d at 769 ("If a variance did occur, we reverse only if the variance prejudiced the defendant's substantial rights."); *see also id.* at 770 ("[T]he variance does not affect the defendant's substantial rights as long as the government establishes the defendant's involvement in at least one of the proved conspiracies.").

[6] A half-ounce is a little more than 14.17 grams.

5

No. 15-30351

"every other week" for a year.[7] A rational jury could infer from that testimony alone—the credibility and weight of which is for the jury, *Grant*, 683 F.3d at 642—that the conspiracy involved more than 280 grams.[8] Additionally, even if it is true that the defendants sold only 0.1 grams of crack per transaction, Officer Pollard, Eugene Allen, and Emanuel Casame testified that the defendants "constant[ly]" sold crack "from sunup to sundown" "every day probably" or "seven days a week" for years. A rational jury could infer that the conspiracy involved sales of more than 280 grams.

B.

Preston questions the sufficiency of the evidence supporting several of his other convictions. First, he challenges his convictions of being a felon in possession of a firearm.[9] One such conviction was based on a .40 caliber pistol found under the hood of his car; the other relied on his order, made during a jailhouse phone call, to an unidentified male to "[t]ell Darryl to give Lot that TEC."[10] Preston maintains the government failed to prove he knew of the gun under the hood of his car or his possession of the gun discussed on the phone. Both arguments fail.

As to the first conviction, Brandy Dwyer testified that Preston "always ha[d] a gun on his side[ and that h]e'd put it under the hood of his car . . . ." At least once, Preston removed the gun from the car, showed it to her, and placed it back under the hood. That testimony supports the jury's conclusion that

---

[7] Evidence showed that the defendants cooked the powder cocaine into crack and that the quantity remained largely the same.

[8] The quantity 14.17 grams multiplied by 26 sales would equal about 368 grams.

[9] He stipulated that he is a felon.

[10] Special Agent Joseph Belisle testified that "TEC" refers to a TEC-9 firearm, which is a "pistol grip, semi-automatic machine gun."

6

Preston possessed (and knew of) the firearm. As to the second conviction, Preston misperceives the nature of constructive possession, which is enough to establish possession in violation of § 922. *See United States v. McKnight*, 953 F.2d 898, 900–01 (5th Cir. 1992). Such possession need not be exclusive and may be joint, and the government proves it with evidence that a person "knowingly has both the power and intention, at a given time, to exercise dominion or control over a thing, either directly or through another person or persons." *See id.* at 901, 903–04. That Preston commanded another person to transfer a firearm, and the other person acquiesced in the order, would allow a rational jury to conclude that Preston had the power and intention to control (*i.e.* constructive possession of) the firearm.

Second, Preston takes issue with his convictions of possession with intent to distribute crack cocaine. The government based that conviction on Preston's possession of twenty individually wrapped crack rocks in a plastic bag, which amounted to a total of 1.9 grams of cocaine base. He claims that that amount of crack is consistent with personal use, so the prosecution could not prove intent to distribute. That theory is colorable[11] but ignores the fact that that the "form" in which police find the crack is illustrative of intent to distribute.[12] In *Cain*, we found an intent to distribute where the defendant possessed only 2.4 grams of crack "broken into over thirty separate pieces." 440 F.3d at 675–76.

Preston possessed a smaller amount in fewer pieces than did the defendant in *Cain*, but, unlike that situation, there was a wealth of evidence related

---

[11] *See United States v. Skipper*, 74 F.3d 608, 611 (5th Cir. 1996) (finding 2.89 grams of crack cocaine alone is insufficient to support a conviction under 21 U.S.C. § 841(a)(1)).

[12] *See United States v. Cain*, 440 F.3d 672, 675 (5th Cir. 2006) ("The form and amount of the cocaine base recovered is some evidence of an intent to distribute.").

to Preston's distribution activity as a member of the conspiracy. Additionally, Preston did not "possess a pipe or other drug paraphernalia consistent with cocaine base use," *see id.*, and he possessed $150 in cash and a firearm, each of which supports an inference of intent to distribute, *see United States v. Kates*, 174 F.3d 580, 582 (5th Cir. 1999). A rational jury could rely on the foregoing evidence to find, beyond a reasonable doubt, that Preston possessed 1.9 grams of crack with intent to distribute.[13]

Finally, Preston asserts that his conviction under Count Two of conspiracy to possess a firearm in violation of Section 924(o) is "nonsensical" and "irrational." Section 924(o) punishes conspiracies to commit violations of § 924(c), which, punishes "any person who, . . . in furtherance of any [drug-trafficking] crime, possesses a firearm . . . ." 18 U.S.C. § 924(c). The jury verdict form provided in relevant part,

> As to the charges set forth in Count 2 of the indictment in this matter (Conspiracy to Possess Firearms), (A) We the jury unanimously find the Defendant, Gie Preston: [Not Guilty or Guilty].
>
> If you find the Defendant Guilty, please make the following finding: We the Jury find beyond a reasonable doubt that Gie Preston possessed firearms in furtherance of: (Check all that apply.)
>
> 1.\_\_\_\_\_ the drug conspiracy as charged in Count 1.
>
> 2.\_\_\_\_\_ the drug crime as charged in Count 3.
>
> 3.\_\_\_\_\_ the drug crime as charged in Count 6.
>
> 4.\_\_\_\_\_ the drug crime as Charged in Count 9.

The jury found Preston guilty of conspiring to possess firearms in furtherance only of the drug crime charged in Count Nine—use of a telephone to facilitate a drug crime in violation of 21 U.S.C. § 843(b). Thus—reading §§ 843(b), 924(c),

---

[13] That conviction served as the predicate for Preston's conviction of possessing a firearm in furtherance of a drug crime in violation of 18 U.S.C. § 924(c)(1)(A). He questioned the § 924(c)(1)(A) conviction only by way of challenging the underlying conviction. Having affirmed the underlying conviction, we also affirm the conviction under § 924(c)(1)(A).

No. 15-30351

and 924(o) in conjunction—the evidence must be sufficient to allow a rational jury to find that Preston (1) conspired to possess firearms (2) in furtherance of (3) his intentional use of a phone (4) to facilitate a drug offense (*i.e.* his underlying conspiracy). It is not sufficient.

The jury presumably relied on Preston's jailhouse phone calls in which he directed members of the conspiracy to transfer firearms and sell crack. Although there is sufficient evidence that he conspired to possess firearms, there is no evidence that any such conspiracy was *in furtherance of* the specific predicate crime on which the jury relied: his use of the phone.

That the conspiracy to possess firearms was one reason he made the phone call is insufficient to show that the conspiracy "further[ed], advance[d], or help[ed] forward the [use of the phone to facilitate the underlying conspiracy]." *United States v. Ceballos-Torres*, 218 F.3d 409, 415 (5th Cir. 2000). Such a relationship between the conspiracy to possess firearms and the phone call would be clear, for example, in a situation where Preston agreed with other inmates to acquire a firearm to subdue a guard and reach a telephone from which he would facilitate his outside drug-distribution conspiracy. But the evidence here made no such showing: Preston's conspiracy to possess firearms in no way advanced his use of the phone.

Similarly, that the conspiracy to possess firearms might have furthered the underlying conspiracy to distribute crack (which was the predicate crime of Preston's § 843(b) violation) or some other drug crime cannot support the conviction. We must review whether the evidence supports his actual crime of conviction, not some other crime of which the jury may have (but did not) convict him. The evidence did not support Preston's conviction under Count Two, because no rational jury could conclude that the conspiracy to possess firearms outside the jail furthered, helped, or advanced Preston's use of the phone

9

No. 15-30351

within the jail.  Therefore, we reverse that conviction.[14]

### III.

Preston appeals the denial of his motion to suppress certain evidence. "Where a district court has denied a motion to suppress evidence, we review its factual findings for clear error and its conclusions of law *de novo*." *United States v. Ortiz*, 781 F.3d 221, 226 (5th Cir. 2015).  There was no error.

### A.

In January 2011, pursuant to warrants, officers searched Preston's car and apartment—uncovering a firearm, drug paraphernalia, and $2,260 in cash.  "A two-step process is generally used to analyze a district court's decision to grant or deny a motion to suppress based upon the sufficiency of a warrant." *United States v. Moore*, 805 F.3d 590, 593 (5th Cir. 2015).  We determine first whether to apply the good-faith exception to the exclusionary rule, which precludes suppression "if reliance on a defective warrant is 'objectively reasonable.'" *Id.* (quoting *United States v. Leon*, 468 U.S. 897, 922 (1984)).  The good-faith exception does not apply in four circumstances, including, as Preston claims, when "the issuing magistrate/judge was misled by information in an affidavit that the affiant knew was false or would have known except for reckless disregard of the truth." *United States v. Webster*, 960 F.2d 1301, 1307 n.4 (5th Cir. 1992).

Preston asserts that the warrants misled the issuing magistrate because (1) Officer Pollard's affidavit contained information he knew was false, and

---

[14] We need not remand for resentencing, because the error "did not lead the district court to impose a harsher sentence." *See United States v. Narviz-Guerra*, 148 F.3d 530, 534 (5th Cir. 1998).  The district court grouped Count Two with Counts One and Six and determined that group's base offense level by reference to Count One only.  Thus, the sentence would be the same with or without the conviction under Count Two.

(2) the search warrant misidentified his apartment.  Pollard averred that he witnessed Mark Dupas purchase crack cocaine from Preston, that he then approached Dupas, and that Dupas dropped crack cocaine as he approached. Preston maintains Pollard lied because Dupas's statements in a police interview conflicted with Pollard's affidavit:  Dupas stated that he was riding a bike rather than walking, that he purchased the crack behind Preston's residence where Pollard could not see them, and that the crack was in his mouth, not his hand, when Pollard approached.

Pollard testified at the hearing on Preston's motion.  The court credited Pollard's affidavit and testimony over Dupas's conflicting statements, reasoning that Pollard was a credible witness, a finding of fact deserving considerable deference because it was based on live testimony.  *See United States v. Rounds*, 749 F.3d 326, 338 (5th Cir. 2014).  Moreover, the court noted that Dupas was less than forthcoming with details about the sale, that he previously had stated he did not purchase drugs from Preston, and that Pollard's affidavit followed soon after the arrest, whereas Dupas gave his statements seventeen months later.  The court's crediting of Pollard's affidavit was not clear error, so Preston's challenge on that basis must fail.

Preston also urges that the search warrant for his apartment was invalid because it misidentified it as a "second floor wooden structure *attached to* the rear of the brick apartment complex . . . ."[15]  (Emphasis added.)  The apartment, he maintains, is not attached to the brick apartment complex but rather is ten

---

[15] Preston does not allege the misidentification was intentional or the result of reckless indifference by an affiant.  He does not couch this challenge in another specific carve-out to the good-faith exception, but it appears to align most with a claim that "the warrant is so facially deficient in failing to particularize the place to be searched or the things to be seized that the executing officers cannot reasonably presume it to be valid."  *Webster*, 960 F.2d at 1307 n.4.

feet behind it. Preston pushes too technical a reading of the Fourth Amendment's "particularity-of-description requirement," which mandates only that "the officer with a search warrant can with reasonable effort ascertain and identify the place intended." *Maryland v. Garrison*, 480 U.S. 79, 91 (1987). That standard was met: Preston's apartment was the only building behind the apartment complex and was only ten feet behind it, and it is actually connected to the complex by a flight of stairs.

### B.

In December 2011, Officers Harold Nunnery and Eric Gillard were patrolling the high-crime area of Saratoga and Thalia Streets in their marked police car when they witnessed Preston and another man arguing on the sidewalk, shouting, and appearing headed for a physical altercation. Noticing also that Preston was holding a large flathead screwdriver, the officers decided to intervene. They exited their vehicle and ordered Preston to drop the screwdriver and lie on the ground; Preston ignored several orders before complying. They handcuffed Preston and frisked him, leading to the discovery of a firearm in his waistband. They searched him and uncovered $150 cash and twenty individually wrapped pieces of crack. Preston asserts the district court should have suppressed the evidence for two reasons: First, there was not reasonable suspicion to support the *Terry*[16] stop at its inception; second, and alternatively, the encounter was an arrest, requiring probable cause, rather than an investigative *Terry* stop. Both arguments fail.

"Under *Terry*, if a law enforcement officer can point to specific and articulable facts that lead him to reasonably suspect that a particular person is committing, or is about to commit, a crime, the officer may briefly detain—that

---

[16] *Terry v. Ohio*, 392 U.S. 1, 9 (1968).

is, 'seize'—the person to investigate." *United States v. Hill*, 752 F.3d 1029, 1033 (5th Cir. 2014). Officers may frisk the suspect if they "reasonably suspect that the person stopped is armed and dangerous." *Arizona v. Johnson*, 555 U.S. 323, 326–27 (2009). Courts must consider "the totality of the circumstances," *United States v. Arvizu*, 534 U.S. 266, 273 (2002), and view those circumstances "in light of [the officer's] experience," *Terry*, 392 U.S. at 27.

The officers justified the stop and frisk by reference to specific and articulable facts: Preston was in a high-crime area[17]; he was arguing with and shouting at another man; he had a screwdriver that could be used to stab the other man or the officers[18]; and he refused to comply with the officers' initial commands.[19] Viewing those articulable facts in light of the officers' experience, the court did not err by finding reasonable suspicion.

Second, Preston avers the stop was in fact an arrest unsupported by probable cause—an argument based on the officers' driving a marked police car, yelling at him, and handcuffing him. "Police detention constitutes an arrest, such that it must be accompanied by probable cause, if a reasonable person in the suspect's position would understand the situation to be a restraint on freedom of the kind that the law typically associates with a formal arrest." *Freeman v. Gore*, 483 F.3d 404, 413 (5th Cir. 2007) (internal quotation marks omitted). "The relevant inquiry is whether the police were unreasonable in failing to use less intrusive procedures to safely conduct their

---

[17] *Hill*, 752 F.3d at 1035 ("The fact that law enforcement officers know a particular area to be high in crime is indeed a relevant contextual consideration." (quotations omitted)).

[18] Preston argues in passing there was no reasonable suspicion to frisk him after he dropped the screwdriver, but doing so did not eliminate the risk that he was armed and dangerous. *See United States v. Wiley*, 493 F. App'x 481, 482–83 (5th Cir. 2012) (affirming frisk after officer removed a knife from the suspect's hip in a high-crime area).

[19] *Hill*, 752 F.3d at 1036 (noting that "evasive" behavior can contribute to context supporting reasonable suspicion).

13

investigation." *United States v. Jordan*, 232 F.3d 447, 450 (5th Cir. 2000).

Precedent precludes the argument that the officers acted unreasonably. In *United States v. Campbell*, 178 F.3d 345 (5th Cir. 1999), officers suspected the defendant of involvement in a bank robbery. While surveilling his house in a high-crime area, officers witnessed the defendant and two other men get into a car in the driveway. Police approached with weapons drawn, ordered the defendant to lie on the ground (with which he complied), handcuffed and frisked him, and detained him for between ten and twenty-five minutes. After concluding the officers had reasonable suspicion to conduct an investigatory stop, we also rejected the defendant's claim that the encounter amounted to an arrest. *Id.* at 348–49. We reasoned "that using some force on a suspect, pointing a weapon at a suspect, ordering a suspect to lie on the ground, and handcuffing a suspect—whether singly or in combination—do not automatically convert an investigatory detention into an arrest requiring probable cause." *Id.* at 349 (quoting *United States v. Sanders*, 994 F.2d 200, 206 (5th Cir. 1993)). We reached that conclusion despite that the defendant complied immediately with the orders.[20]

The facts of Preston's case are not materially distinguishable. Preston was in a high-crime area when officers ordered him to lie on the ground, handcuffed him, and frisked him. Unlike the situation in *Campbell*, officers stopped Preston immediately following the threatened criminal activity, and he initially refused to cooperate. The encounter was not an arrest, because "the police were [not] unreasonable in failing to use less intrusive procedures to safely conduct their investigation." *Jordan*, 232 F.3d at 450.

---

[20] *See Campbell*, 178 F.3d at 349 ("Although there are some differences between this case and the facts of *Sanders*—here there was no sign of non-cooperation and the stop happened about 30 hours after the bank robbery—that does not mean that the use of drawn guns and handcuffs was unreasonable.").

No. 15-30351

IV.

Burnell posits that his trial counsel labored under an actual conflict of interest, because they had represented two of the government's witnesses, and that the conflict adversely affected his representation.  Whether counsel labored under an actual conflict is a mixed question of fact and law that we review *de novo*.  *United States v. Burns*, 526 F.3d 852, 856 (5th Cir. 2008).  We review for clear error the underlying factual findings, such as a determination of a witness's credibility.  *See United States v. Culverhouse*, 507 F.3d 888, 892 (5th Cir. 2007).

"The Sixth Amendment right to counsel includes the right to representation that is free from any conflict of interest."  *Culverhouse*, 507 F.3d at 892 (quotations omitted).  We review representation for an "actual conflict," which "is a conflict of interest that adversely affects counsel's performance."  *Mickens v. Taylor*, 535 U.S. 162, 172 n.5 (2002).  "Multiple representation does not necessarily create an actual conflict of interest."  *Culverhouse*, 507 F.3d at 892.  "[T]here is an actual conflict when the attorney knows that his clients' interests diverge and must then choose between the interests of multiple clients, or be compelled to compromise his duty of loyalty."  *Id.* at 893.

The question is "highly fact-dependent," *Burns*, 526 F.3d at 856, and involves several factors, including "(1) whether the attorney has confidential information that is helpful to one client but harmful to the other client; (2) whether and how closely related is the subject matter of the multiple representations; (3) how close in time the multiple representations are; and (4) whether the prior representation has been unambiguously terminated," *id.* Also relevant are the "character and extent of the prior representation" (*i.e.* whether it was "transient or insubstantial"), *Perillo v. Johnson*, 205 F.3d 775, 799 (5th Cir. 2000), and whether counsel demonstrates "an abundance of

15

caution" by allowing co-counsel to cross-examine the prior client, *Burns*, 526 F.3d at 857.

Jason Williams and Naomi Campbell, attorneys at the same firm, jointly represented Burnell during this federal trial.  The alleged conflict arises because Williams previously had represented government witness Eugene Allen in five state-court criminal cases between 2000 and 2009, and Campbell had represented government witness Nukema Frith in one state-court criminal case during 2011 and 2012.  Even if questionable, Williams and Campbell's agreement to represent Burnell did not rise to the level of an actual conflict.

First, Williams and Campbell testified that they acquired no confidential information about Eugene or Frith.  *See Burns*, 526 F.3d at 856.  That assertion seems unpersuasive, because Williams represented Eugene in five cases over nine years, and Campbell represented Frith for about six months.  The court credited the testimony, however, because it found that Williams and Campbell were credible witnesses, that the firm had between sixty and seventy cases open at all times and "at least five or six cases" active in Louisiana state courts each week (so they did not spend a significant amount of time on each individual client), and that Williams's and Campbell's representations focused on securing plea deals rather than in-depth substantive defenses.  It was not clear error for the court to conclude, as a factual matter, that Williams and Campbell had acquired no confidential information.  *See Culverhouse*, 507 F.3d at 892 (reviewing underlying fact-findings for clear error).

Second, four of Eugene's five cases and Frith's case were completely unrelated to Burnell's case.  But, Eugene's 2009 state-court case stemmed from the same conspiracy in Burnell's trial:  Burnell was an indicted co-conspirator in Eugene's 2009 case, Eugene was an indicted co-conspirator here (he pleaded guilty before trial), and the government used video evidence of the conspirators

16

selling crack that Louisiana used in the 2009 trial. Thus, as the district court found, "[t]he similarity of the subject matter of the representation is plain," but we must view this fact in light of the other factors that weigh against finding a conflict of interest.

Third, Williams last represented Eugene when he arranged for Eugene's guilty plea in 2009—five years before Burnell's trial. Less time elapsed between Campbell's representation of Frith and Frith's participation in Burnell's case. Frith began cooperating with the government only one week after she pleaded guilty to her unrelated charges in 2012, and she testified before the grand jury in this case about six months later. Campbell, however, was uninvolved in Frith's cooperation with the government and did not encounter Frith again until she testified at Burnell's trial in 2014—two years after Campbell had last represented her.

Fourth, Williams undeniably terminated his representation of Eugene about five years before Burnell's trial. Although Frith started cooperating with the government only a week after Campbell had negotiated her guilty plea in 2011-2012, and she testified in hopes that she would receive a reduced sentence in that case, she testified two full years after she had pleaded guilty in the prior case. Also, there was no indication whatsoever that Campbell continued to represent or assist Frith in her effort to get a reduced sentence.

Finally, the court deemed a conflict of interest to be less likely because both Williams and Campbell displayed an "abundance of caution" by allowing the other to cross-examine the former client. *See Burns*, 526 F.3d at 857. Also, the court concluded that the "character and extent" of the prior representations was "transient and insubstantial." That finding was not clearly erroneous: Other attorneys made multiple appearances on behalf of Eugene and Frith in the prior cases; the firm handled "hundreds of cases" in the Louisiana state

17

courts, and each of Eugene's and Frith's cases ended with a guilty plea rather than a trial; Williams focused only on securing guilty pleas, and Eugene was less than forthcoming in discussions with Williams; and Campbell represented Frith for only six months during her eleven-month case, and Frith actually considered Thomas Schlosman (one of Williams's and Campbell's associates) to be her lawyer.

Again, we decide only that the multiple representations did not rise to the level of an actual conflict of interest that violates the Sixth Amendment. Williams and Campbell learned of the potential conflict two days before trial when the government disclosed its witness list, but they never notified Burnell or the court of the conflict or explained to Burnell the importance of conflicts of interest or requested that he waive the conflict. Even if that conduct violated ethical rules[21]—a question that we do not decide—that is not the relevant standard.[22] Reviewing the factors from *Perillo* and *Burns* as it did, the court did not err by concluding Williams and Campbell did not labor under a conflict of interest.[23]

Preston's conviction under Count Two is REVERSED. The judgments are AFFIRMED as to all three defendants in all other respects.

---

[21] "A lawyer who has formerly represented a client in a matter shall not thereafter represent another person in the same or a substantially related matter in which that person's interests are materially adverse to the interests of the former client unless the former client gives informed consent, confirmed in writing." LA. R. PROF. CONDUCT 1.9(a).

[22] *Nix v. Whiteside*, 475 U.S. 157, 165 (1986) ("[B]reach of an ethical standard does not necessarily make out a denial of the Sixth Amendment guarantee of assistance of counsel.").

[23] Because there was no conflict of interest, we need not address whether there was an adverse effect on Burnell's representation.